[Crim. No. 4659. Second Dist., Div. Two. July 18, 1952.]

THE PEOPLE, Respondent, v. GLENN GORDON DAVIS, Appellant.

Morris Lavine for Appellant.

Edmund G. Brown, Attorney General, Stanford D. Herlick, Deputy Attorney General, S. Ernest Roll, District Attorney (Los Angeles), and Mark Brandler, Deputy District Attorney, for Respondent.

MOORE, P. J.—Appellant was convicted on 23 counts of grand theft. He now demands a reversal of the judgments on the grounds of insufficiency of the evidence to support the verdicts, and errors in giving and in refusing certain instructions.

### SUFFICIENCY OF THE EVIDENCE

In April, 1947, appellant was a salesman of used cars. He met certain engineers of an aircraft company and requested them to redesign a three-wheel automobile which he called the "Californian." He was without funds to employ the engineers and had not at that time made any investment whatsoever in his prospective enterprise. Prior to August, 1947, the engineers dismantled the "Californian" for the purpose of assembling engineering data. During the last named month, appellant organized the Davis Motor Car Company and established its headquarters in a building on Woodley Avenue in Van Nuys. The company had no equipment, was without capital, without manufacturing experience and without a definite design for the building of the three-wheel automobile. However, appellant caused lines to be painted on the floor of the building to simulate assembly lines which might inflame the imagination of prospects who would come to purchase territorial franchises for the sale of the car. The selling campaign commenced August 6, 1947. Sales were made to the several parties named in the indictment. In each instance of the 23 verdicts included in the judgments here on appeal, the sales were induced by appellant's false statements, promises and representations which were relied upon by the purchasers.

Appellant stated to Messrs. Ragan and Wiley (Count 1) that the engineering on the car was complete; that he was ready to commence building the three-wheel car; that he had a contract with Hercules Motor Company for motors; war contractors would build the parts and appellant would assemble them; that about the first of 1948 Ragan would have a car to show on his floor and soon thereafter cars would be "running out of his ears." Relying upon such statements, Ragan and Wiley paid appellant part of the purchase price for a franchise for the three cities of Glendale, Montrose and Burbank. Thereupon Ragan leased a building for the operation of his business for two years at a monthly rental of $300.

Having read an advertisement in a San Francisco paper about the three-wheel automobile, the witnesses Straub and Gregory visited the plant of the Davis Motor Car Company in September, 1947, where appellant told Straub that he had put $150,000 of his own money into the business; that he was drawing nothing from it; that no one would receive a cent until the car was produced; that the plant would be producing

cars at the rate of 50 a day in from 30 to 90 days; that he had contracts for Hercules motors and contracts with airplane companies for aluminum panels. In reliance upon such statements of appellant on three separate occasions they paid him $500, $1,000 and $1,500 (Counts 2, 3 and 4) as payment for a franchise for Petaluma, Sonoma and Napa counties.

In order to induce the witness Paige to purchase a franchise, appellant made substantially the same statements he had made to Gregory, Straub and Ragan, and stated that the car would be built by having the various subcontractors ship the parts to the plant at Van Nuys where they would be assembled; that they would make 10 models before January, 1948; that thereafter the company would get into production at the rate of 50 cars per day; that Paige would have cars for sale by the first of the year; that moneys paid for franchises would be used to produce the car. While relying upon such statements of appellant, Paige paid him $1,500 in September on a franchise for Marin County and thereupon leased a showroom for two years as a salesroom for the three-wheel automobile. In February, Paige paid appellant the first installment of the price of a franchise on Alameda County. Thereafter while still relying upon the same statements which appellant had made to him, he made the final payment of $1,800 on March 3. (Counts 5, 6, 7.)

In September, 1947, the witness Decker accompanied by his friend Looschen (Counts 8 and 9) visited the plant of the Davis Motor Car Company where they engaged appellant in conversation with respect to the outlook for the three-wheel automobile, the method of financing and expenditures of the money. At that time appellant stated that the franchise money was to be used for the production of the "Californian"; that Hercules Motor Company would supply the motors at the rate of 50 per day; that the company would commence with the production of 200 cars a month; and thereafter increase to one thousand monthly; that if Decker and Looschen would purchase a franchise, they would receive their first shipment of the automobiles within 60 days. Thereupon the two investors together, believing in and relying upon appellant's statements paid him $500 as part payment on a franchise for the Santa Monica area. The second payment of $1,000 was made in November.

In September, 1947 Harold Libby (Count 10), a minor and a student at Fresno State College, read of the three-

wheel car and visited the Davis plant. In August, 1947, appellant told Libby that he had commenced work on the automobile prior to 1942; that within from 30 to 90 days the company would be producing at the rate of 50 cars per day; that to make possible such production, appellant stated that 150 subcontractors in the Los Angeles area were making parts which would be assembled at the plant in Van Nuys; that the engineering was practically completed and plans were ready for production; that it had received approximately 150,000 miles of testing and had stood up under all conditions. In reliance upon such statements, Libby paid appellant on behalf of himself and his wife, $1,500 as part of the $5,000 purchase price for a Fresno franchise.

In October the witness O'Hara (Counts 12 and 13) visited with appellant at his office in Van Nuys. The latter told him that the engineering on the automobile had been completed; that he had a contract with the Hercules Motor Company to supply him with 250 engines to start with; that he had contracts duly executed with various companies to manufacture the parts; that he would produce 50 cars daily beginning January, 1948, by assemblying the parts at the plant; that production will be increased to one thousand a week when the crew became experienced; that he had a machine on the way to make body panels; that every penny was being put into a fund for the production of the car, that if he purchased a franchise, O'Hara would get cars in January, 1948. While relying upon such statements of appellant, O'Hara paid him $2,500 in October as part payment on a franchise for Santa Ana and on January 16 paid him $2,250 to complete the purchase.

The witnesses Evans and Zeravica (Counts 14, 15, 16) visited appellant at his plant in October, 1947. Evans was a hay-bailer and Zeravica was a rancher. Appellant told Evans that if they purchased franchises, they would have a car by January, 1948; that thereafter the car would be in production at the rate of 50 a day, increasing to an output of 200 daily; that he had invested between $100,000 and $200,000 in the production of the automobile. Relying upon the statements of appellant, Evans and Zeravica paid the Davis Motor Car Company $500 in October and $500 in November on account of the purchase of a franchise for the city of Lancaster and in December they paid him the balance of $1,000 on the purchase price for such franchise.

In November, 1947, the witness Browne (Count 17) was

told by appellant at the Van Nuys plant that a great deal of time had been spent in the development of the three-wheel car; that it had been perfected mechanically and was ready to go into production of 200 daily within 30 days; that in six months they would be producing 1,000 cars a day; that the parts would be fabricated at various aircraft companies including Douglas and Lockheed. When Browne told appellant of another car manufacturer who was having trouble with franchise holders because of misapplication of the funds paid for franchises, appellant said, "there is nothing to worry about because all moneys which are paid into the company by franchise holders will be held in trust to be used for the purpose of development and manufacture of the Davis car"; that he had contracted for a thousand engines per day with the Hercules Motor Company and Browne would get his first cars in the very near future. Relying upon appellant's statements, Browne paid $5,000 for a franchise covering North Hollywood and Compton areas. Notwithstanding the sale of the Compton franchise to Browne, appellant made a sale thereof to Messrs. Scoville and Lea for $6,500.

In October, 1947, appellant told the witness Coppetti (Count 18) that he would be in production within 60 to 90 days; that if Coppetti purchased a franchise he would receive a demonstrator within that period; that he had contracts for Hercules motors and other parts of the automobile. While relying upon such statements, Coppetti borrowed $2,500 with which to purchase a franchise for the city of Oakdale.

In July, 1948, the witnesses Heydon and Allec (Counts 22 and 24), furniture salesman and drive-in market operator respectively, visited the Davis plant in Van Nuys to discuss the advertisement they had read about the three-wheel car. Neither had had previous experience in the automobile business. Appellant told them that the engineering and tooling on the car had been completed; that it would be in production within 60 to 90 days at the rate of 50 cars per day; that there would be no material shortages because they had three or more contracts for each of the essential materials for the car; that he had contracts with Hercules and Continental for motors; that the franchise moneys would be used for the sole purpose of producing the automobile and that no money had been used for anything else. In reliance upon such statements, Heydon and Allec purchased a franchise for El Monte. They paid $500 on July 20 and $3,000 on July 23.

The statements of appellant with respect to the readiness of the plans and specifications for the Davis car, the time within which it would be finished, the time within which exhibition cars and those for sale to the public would be available were not true. Three engineers employed by appellant established that the engineering was never completed on the three-wheel car; that nothing had been planned by the engineers concerning the differential, transmission or other component parts. While one prototype car was completed in November, 1947, it was not made ready for commercial production. It had a Ford transmission, Ford rear end, a Plymouth steering gear and Ford wheels. Appellant requested his engineers to repaint the first car a different color at various intervals in order that it might appear that there were many Davis cars on the road, instead of just one. Appellant told his men that if he could get 10 cars he would create the illusion that 100 cars had been produced. The first creation of the Davis Company was painted twelve times and was given at least two sets of upholstery. The shop engineer informed appellant in October, 1948, that they were not ready to produce 50 cars a day nor would such condition occur during that year, but appellant had a shipment of cobblers' sewing machines moved into the factory and stated that any machinery he could have about would be a good front. When the engineers asked appellant for instructions as to what they should tell the franchise holders who made inquiry, appellant replied, ''tell them nothing. We have got their money. Let them go to hell.''

The company's tool designer, Mr. Woodin, testified that there were some jigs at the plant, but that they were such as could not be used for mass production. And he established that the engineering on the three-wheel car was not completed in February, 1949. The same testimony was given by the witness Bricker, production engineer. There was no production machinery to produce any number of cars. During the two years of engineer Bricker's association with appellant, a total of 14 three-wheel automobiles were completed, but they were built by hand. Not one was made for sale to the public. The company was without tools to engage in manufacture, none for the assembly of car doors; it was not even possible to obtain tools from a tool manufacturer since they had no designs for such tools. Whenever engineer Charipar requested appellant to purchase machinery and equipment for the factory, his reply was, ''there is not enough capital

available and such purchases can be made at a later time."
Mass production cannot be commenced unless a factory is com-
pletely equipped with tools. No testing of a completed car
was ever made except the run of a prototype car from Detroit
to Chicago. The witness Kelly, sales engineer for the Hercules
Motor Corporation, established that appellant never had a
contract for Hercules motors. While appellant purchased
one motor in 1947 and subsequently nine others, the Hercules
company refused to open a purchasing account with appellant
for the reason that he had not established any credit. Not-
withstanding appellant's promise that a large machine was
on its way from the east to be used in forming large body
panels, it never arrived. No production car was ever manu-
factured or engineered with complete tooling. The witness
Yates had been employed by appellant to prepare brochures
as advertising material. When he advised appellant that the
franchise purchasers were requesting them, appellant told
Yates not to spend any more time on such franchise owners
as he already had their money. When in early January,
1948, a number of franchise holders called to inspect the plant,
appellant stated, "to hell with them. Lock up the plant and
don't let them see it." When on another occasion a franchise
owner requested an automobile for demonstration purposes,
he said, "to heck with him. We have got his dough." When
an agent in Washington, D. C., opened an office for the pur-
pose of selling franchises on the Davis car, appellant com-
menced his letter by saying, "this will serve to authorize you
to let you deposit the loot."

### APPELLANT'S PERSONAL GAIN

Prior to the "beginning" of the sales of franchises, appel-
lant resided in a garage apartment for which he paid a
monthly rental of $44.50. He had mortgaged his household
furniture and pawned his ring. In the summer of that year
he borrowed money to buy groceries. He had borrowed a
1941 Plymouth for his transportation. On the day he sold
his first two franchises for a total of $3,250, he gave the nurse ·
for his children $100 with the statement that he had sold
his first franchise. He made a payment of $150 on his chattel
mortgage and redeemed his ring. In the same week, he and
his wife left for a weekend in Ojai Valley. For the sojourn
at the inn he paid $78.49. Prior to his receipt of $15,000
from sales of franchises he had no bank account and kept all
money in his pocket; had no bookkeeper prior to December,

1947. In January, 1948, appellant leased a home on Benedict Canyon Drive at a rental of $400 a month and paid one year in advance. He had a check written payable to cash which he applied to the payment of his lease for one year and instructed his employee to charge it to sales expense. Six months later he purchased the house for $25,000 cash and charged that sum to the "plant expansion fund" of the Davis Motor Car Company. When the company's bookkeeper transferred the $25,000 to appellant's personal drawing account he was told by appellant that it was none of his business what the $25,000 was for; that it was his money and that he would do as he pleased; that he did not want it reflected on the books of the company and thereupon the bookkeeper deleted it.

The fact that appellant denied the accusatory and damning testimony presented against him can avail nothing now in effecting a reversal. Substantial proof having been adduced in support of the information, this court is powerless to interfere with the judgment by weighing the evidence "but will decide only whether upon the face of the evidence it can be held that sufficient facts could not have been found by the jury to warrant the inference of guilt." (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].) Paraphrasing the cited decision no showing has been made that upon no hypothesis whatever is there sufficient evidential support for the verdict. Because an adverse verdict might have been reached by another jury or by this court or because in our opinion the evidence might be reconciled with innocence, a reversal is not authorized. (*Ibid.*)

Appellant had not enjoyed a liberal education. His studies had been confined almost exclusively to mechanical engineering, but no high degree of efficiency appears to have been achieved by him. He had ultimately engaged in dealing in used cars with a minimum of success. From his testimony he had expended no great amount of genius on the three-wheel design. He obtained one which had been constructed by one Joel Thorne. After appellant had rebuilt it and abandoned it "at the Woodley Avenue plant, finally someone came out there and claimed it . . . the car was completely wrecked." At that time he undertook to finance the manufacture of the model by negotiations with the Bank of America, the Jewel Tea Company, Swift and Company, Consolidated Vultee, Lehman Bros., and a group on Wall Street, but without

success. He was advised by brokers of the difficulty of getting "venture capital."

When he began the campaign to raise moneys by the sale of franchises he prepared a form of contract for his investors to sign. It contained clause 21 which provided that "the consideration paid for this franchise is not refundable and Davis shall have no obligation to make any refund. No representation is made as to time of delivery of automobiles or parts. In the event that through no fault of Davis, motor cars are not produced, Dealer waives all claims against Davis arising from this agreement." After some dealers had purchased franchises, appellant consulted a lawyer who revised clause 21 to read that "the consideration paid for this franchise is in no way to be interpreted as a trust fund for the benefit of Dealer and that said consideration is the sole property of Davis."

From the language used in both quoted clauses it would be difficult for any unprejudiced jury to derive any conclusion of appellant's innocent purpose. Although he was penniless, he frames a contract for his victims to sign designed to transfer to his ownership such funds as he by his conversation may cause his patrons to invest. By his spoken words he was pursuing a course to obtain moneys with which he would invent, construct, and manufacture in large lots an automobile of a fanciful design but by his writings he relieved himself of delivering cars or parts forever and pocketed the dealer's waiver of "all claims arising from this agreement." And while he was obtaining funds in exchange for a specified territory in which the dealer might make sales of the "Californian," he was falsely telling his victims that he had contracts with makers of "parts" to supply him, had a contract for Continental and Hercules motors, had sufficient machinery for mass production; telling his employees he did not care about his investors because he had their money, was not interested in low income groups; telling his Washington agent to deposit "the loot." During the early stages of his enterprise he took the very money he had induced his franchise purchasers to pay to him for manufacturing the three-wheel automobile and leased an extravagant home, then purchased it for $25,000, practically one year from the time he was borrowing money with which to buy groceries and insisted to his bookkeeper that the withdrawal of the $25,000 should not appear on the books of the company.

Despite such proof of his felonious purpose, appellant mournfully asserts: he always intended to produce the cars in mass in accordance with his agreement; made no misrepresentation; had no intent to defraud; the dealers got what they bought; the money was used as represented; *frustration of purpose or impossibility of performance is a complete defense!*

## GRAND THEFT

■ The crime of grand theft is committed when a person obtains the money or property of another by taking it from the possession of its owner without his consent, by obtaining it by deceit and false pretenses, or by embezzling it after it has been entrusted to the thief.

■ Appellant is guilty of grand theft under the doctrine of *false pretenses*. He had nothing of value. The three-wheel vehicle was the cast-off toy and gift of a sportsman who had evidently built it for his own amusement. Appellant told his prospective engineers that he had paid $10,000 for the car. He rented a building to be used as a pretense of a factory, painted lines on its floor to pretend that the toilers to be employed would there construct his "dream" into a reality. He had no useful tools for two years during which he was garnering the wealth of his "dealers" by his statements, opinions and promises, selling to unsuspecting, trusting men "franchises" to sell in prescribed areas the phantom machine. The naked declaration of his purpose: a penniless man to sell dealers the privilege of selling an automobile which had not been invented and to promise to use their money with which to design it, to erect a factory and to produce the car in mass—such a plan in its very essence was dishonest.

Despite his contrary statements to his coveted "dealers" appellant had not worked on the three-wheel before the war. His purpose in making such declaration was to create in the mind of a victim that his promises of a successful machine and of early production were the result of seasoned reflection, long study and careful experimentation. The fact is that he had no knowledge of the three-wheel prior to his ill-fated gift from Mr. Thorne. When he commenced his franchise sales, he did not work on the invention to try to build a practical product but engaged mechanical engineers on contingent compensation.

His statement that he had worked on the three-wheel before the war served another purpose. It gave factual support to

his promise that mass production would begin within 90 days. When he told his "dealers" that the engineering data was complete and that a "production car" would be ready by November, 1947, he intended to convince them that the plans were the fruitage of years of study. He knew at the time that the engineering had not been completed for either the car as a whole or for any essential part. He had neither blueprints nor production machinery. Such condition continued during the two years of his sales of franchises. While he built 14 three-wheel cars in that time, they were made by hand. When his engineers urged him to obtain necessary machinery with which to turn out quantities for the public, appellant replied that he did not have sufficient capital.

Appellant's assurances that (1) in 1947 the plant would be producing 50 cars within 90 days after August; (2) in 1948, 50 cars daily would be produced and (3) within six months after November, 1947, the company would produce 1000 cars a day were false and deceitful promises and opinions accompanied by his false statements as to the completion of the engineering plans and his implied declaration that he had sufficient capital on hand. Such promises were as false and as illy-conceived as his statements that he had a contract with the Hercules Motor Company for the motors to be used. Such statement and those with respect to the availability of other parts were material. Their pronouncement came with special force during the postwar period when the procurement of such items in mass was doubtful and their steady flow was indispensable to the production promised by appellant. The fact that appellant had no contract with the Hercules company did not dampen his ardor or mollify his enthusiasm in telling as a fact that he had such agreement.

His statements that subcontractors were building parts for the three-wheel had not the slightest foundation in fact. He had no standardized plans. His statements that a prototype car had been tested for durability and mechanical efficiency by being driven 150,000 miles, and that the cars would have the benefit of extensive experimentation were made for the purpose of convincing the investors that the production car would be a perfect unit of mechanical art. In truth, the prototype had journeyed only from Detroit to Chicago.

That he had invested $150,000 of his own money in the three-wheel enterprise was a material misstatement. Showing his faith in the plans he was exploiting by putting a small fortune into it must have inspired the "dealers" with appel-

lant's gallant leadership, they being ignorant of the fact that appellant had never possessed one-tenth so much money.

Finally, appellant's lure with which to entrap the more thoughtful investor was his promise to impound the moneys received for the franchises in a special fund to be used solely for developing the design and for producing the car. Appellant had no intention of performing such a promise. On most of the occasions when he made it, he had already used $25,000 for the purchase of a home, had paid old bills and redeemed his pawned and mortgaged movables. If he would so treat the fund in the early stages of its existence, could appellant ever have intended to fulfill his promise? But he knew that the confidence of the investors had to be gained and the only available instrumentality he had for such purposes was words—his own false words!

■ The foregoing statements of fact by appellant were made while he was (1) conscious of their falsity or (2) in a reckless disregard of their truth. In either event they constituted actionable fraud. (*People* v. *Cummings*, 123 Cal. 269, 271-272 [55 P. 898] ; *People* v. *Daener*, 96 Cal.App.2d 827, 831-832 [216 P.2d 511].) His promises and opinions are equally vicious. The promises were made without intention of performing them and are therefore fraudulent. ■ His opinions were given concomitantly with his statements of fact which gave material support to his opinions expressed to men who were ignorant of the true facts, and were therefore actionable fraud. (*People* v. *Arberry*, 13 Cal.App. 749, 757 [114 P. 411] ; *People* v. *Walker*, 69 Cal.App. 475, 480 [231 P. 572] ; *People* v. *Ryan*, 103 Cal.App.2d 904, 908 [230 P.2d 359] ; *People* v. *Jones*, 36 Cal.2d 373, 377 [224 P.2d 353] ; *People* v. *Mason*, 86 Cal.App.2d 445, 449 [195 P.2d 60].)

■ But he did not rely on words alone. He caused the hand-built ''Californian'' to appear on the streets in paints of different colors to make it appear that he had many three-wheeled vehicles. He said to his associates that if he had 10 automobiles he could create the illusion of 100. In order to create a showing of activity in his ''plant,'' he moved in a number of sewing machines ''to have a good front.'' He was not interested in his ''dealers'' any more after he had their ''dough.'' ''To hell with them; lock up the plant; don't let them see it.''

His letter to his Washington agent in respect of ''depositing the loot''; his second sale of the Compton franchise; his spending the franchise moneys in payment of old debts; his

keeping $15,000 in his pocket instead of depositing it in the "fund" and his purchase of the expensive home with money entrusted to him—these and other expenditures, diversions of a trust fund at a time when the moneys could have been used in manufacturing or inventing the three-wheel, were sufficient to convince the jury that appellant had no intention of producing a car for the market, but that he obtained a contract with clause 21 and made his plans for acquiring money without work.

## Not Puffing

The statements and promises of appellant were not "puffing" as he contends. He uttered untruths concerning material facts and made false promises. "Puffing" is a term applied to a salesman's description of a product which is wholly within the view of the prospective buyer. It does not consist of such statements as those used by appellant in selling the right to distribute a machine not yet invented within a specific territory. He was forced to describe a thing yet to be created and after that to be produced in mass. The purchasers had nothing to buy but the picture painted in the words of appellant. ■ Where a party offers to sell an interest in a business which has not been established and paints a rosy picture of its future based upon false statements which the prospective purchaser believes to be true, the fraud is complete. (*People* v. *Jones,* 36 Cal.2d 373, 377 [224 P.2d 353].)

## Promises

Neither may appellant be freed from liability by reason of the fact that some of his representations were promises. ■ Fraud can be perpetrated by a promise to do an act if at the time of making it he intends not to perform. (*People* v. *Mason,* 86 Cal.App.2d 445, 449-453 [195 P.2d 60].) From the nature of appellant's representations and the circumstances under which they were made it is obvious that his promises were made in bad faith. He knew that his entire scheme was an imaginary Pandora's box that would open surely as a consequence of his receipt of his victims' money and that many of his promises were recklessly made without regard to their falsity. He did not care. That the dealers believed what he said pleased and encouraged him and because they relied upon his utterances, the jury correctly and readily determined that he had committed grand theft. (*People* v.

*Chait,* 69 Cal.App.2d 503, 514 [159 P.2d 445]; *People* v. *Steffner,* 67 Cal.App. 1, 13 [227 P. 690].)

### FRUSTRATION

Appellant argues that his failure to complete the design and manufacture of the three-wheel was due to hindrances he had not caused and could not obviate and that by virtue of the doctrine of frustration his failure to succeed in materializing his promises is excused "whenever a fortuitous event supervenes to cause a failure of the consideration or practically total destruction of the expected value of the performance." Appellant's concept of "frustration" is a vagary, a hallucination, evidently conceived for the purpose of forestalling demands for the moneys paid him when he should ultimately be faced with the tragic emptiness of his folly. He says it is impossible to perform and that his obligation is suspended by reason of such impossibility with reference to which they had agreed. His contract does not negative a criminal intent. It was one item of evidence which was considered by the jury who determined that appellant took the money in each of the 23 counts.

### RULINGS ON ADMISSIBILITY

Assignment is made of the court's ruling in allowing the dealers to vary the terms of the written contract by parol evidence of appellant's contemporaneous oral statements. The argument is made that such ruling violates the due process doctrine of the 14th Amendment as well as the best evidence rule. The answer is that the statements of appellant did not vary the terms of his writing. His oral affirmations and his written declarations were all his representations in the trial of a fraud action. He is not the agency to decide first that one or the other is free from fraudulent vice and thereafter to make his choice. In a prosecution for a criminal fraud, the jury may consider the acts and utterances as well as the writings of the accused. (*People* v. *Sidwell,* 27 Cal.2d 121, 126 [162 P.2d 913]; *People* v. *Pierce,* 110 Cal.App. 2d 598, 605 [243 P.2d 585].) In an action taken for a crime committed in relation to a contract, the state is not a party to, and is not bound by, the contract. It may prove the true nature of the transaction. (*People* v. *Chait, supra,* p. 519.) The prosecution of appellant is based upon his acts which are forbidden by law. The proof of his guilt may obtain in both his writings and his oral declarations. Why

should either be excluded? The purpose of a trial is to derive the truth. ■ Where fraud is shown, parol evidence does not contradict the writing involved. It merely shows that no binding contract was legally made or did not express the actual agreement. (*Barham* v. *Barham*, 33 Cal.2d 416, 422-423 [202 P.2d 289]; *Lynn* v. *Herman*, 72 Cal.App.2d 614, 617 [165 P.2d 54].) For the reasons herein stated, it was not prejudicial to instruct the jury to consider evidence other than the contract.

## No Error in the Instructions

■ Appellant contends it was prejudicial error to give the instruction[1] with reference to whether a false pretense upon the mind of the representee continued and was relied upon when the latter parted with his property for the reason that there is no authority which recognizes continuing representations. Appellant concedes however, that a representation is actionable if it "be shown that it was still in the mind of the person to whom the representation was made at the time he acted, and that he acted thereon." Such was the gist of the instruction as given. No error appears. (See *People* v. *Rabe*, 202 Cal. 409, 413 [261 P. 303]; *People* v. *Howes*, 99 Cal.App.2d 808, 818 [222 P.2d 969].)

■ Appellant also urges error in the giving of an instruction[2] that in considering the evidence the jury should take into consideration whether a reasonable person would have believed and relied upon such representations. It is con-

---

[1] "When it is shown that there was some space of time between the making of a fraudulent representation or the use of a false pretense and the time when the person who, by employing such false means, obtained the property of another, the length of time between the two events is not of itself controlling, the question being whether the effect of the false pretense upon the mind to which it was directed continued, operated, and was relied upon at the time the property in question was given over.

"When any false and fraudulent representation or pretense has been made, the law considers it as continuing so as to cover any money or property received as a result thereof."

[2] "If you should find that any person named in a particular count of the information was shown any writing or document prior to the time that he paid any money in connection with the transaction involved and there were provisions in such document which were contrary to or inconsistent with representations which such person, so seeing the document, claims to have heard, then, for the purpose of determining the credibility of the testimony of such witness, you may take into consideration the question whether a reasonable person would have believed and relied on any such oral statements."

tended that such instruction ignores the written contract, and makes the accused liable for obtaining the money if the jury believe incredible statements. Such is not the effect of the instruction. The jury were told to consider both the oral representations and the contract. If the jury believed the accused made grossly incredible representations and believed that a reasonable person would have believed in and relied on them, their "incredibility" will not avail him on a trial for his fraud. Since the representations of appellant were such, if true, as promised a successful business venture the jury correctly determined that since they were false the damage was attributable to appellant's fraud. (*People* v. *Pearson*, 69 Cal.App. 524, 531 [231 P. 612].)

 Finally, the court instructed on the necessity of the jury's unanimity with respect to "at least one specific, false representation."[3] Appellant contends that essential factors were omitted from that instruction; that the one fraudulent representation made "must have been agreed by the jury" to have been the one relied upon by the complainant in parting with his money; that "the jury must have been unanimous that it was the particular reliance by the complainant upon which he acted, and not some other representation."

Appellant's criticisms of the last quoted instruction are all answered by the court's general charges. CALJIC. 226 was given in its entirety. It requires some false pretense to have been used by defendant to perpetrate the fraud and it must have been a material element; also, the fraud must have been thereby effected. Moreover, the jury were told that for a false representation to be material the owner must have relied and acted upon it; "you must all agree upon at least one specific false . . . representation as having been made . . . If you find that any false representations were made to a particular . . . witness . . . at least one of such representations must have been a material element in inducing that . . . witness to part with his money before the defendant may be found guilty of the crime of theft" etc; "you are not to single out any certain sentence . . . in the instructions and ignore the others, but you are to consider all instructions as a whole."

---

[3] "Before you may return a verdict of guilty of theft by obtaining property by false pretense under a particular count, you must all agree upon at least one specific false and fraudulent representation or pretense as having been made by the defendant, if you find that he made any, which representation or pretense must be of the kind and have the effect as defined for you in these instructions."

But aside from the foregoing, CALJIC's 239[4] was given. It is a complete answer to appellant's point as to unanimity on one false representation. And the stock instruction on reasonable doubt was tantamount to a caution not to convict unless convinced to a moral certainty and beyond a reasonable doubt. They were thereby empowered to acquit appellant if they could not unanimously find that they had believed and relied upon at least one false pretense in each of the 23 transactions involved in the 23 judgments.

The judgments are affirmed.

McComb, J., and Fox, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 14, 1952.

---

[4] "When, as in this case, a defendant is charged with having obtained property by false pretense, and it is alleged in the information that the defendant used two or more different false pretenses as means of obtaining the property of another, it is not necessary to justify a verdict of "guilty" that the jury find that all the alleged false pretenses were used. Proof that there was one instance of defendant's using a false pretense which was a material inducement, in reliance on which the complaining witness parted with his property, and proof that the other requisite elements of the alleged crime were present, are sufficient to sustain a conviction if that proof meets the standard of convincingness required by the law."