[No. C005229. Third Dist. Jan. 29, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
BUFORD L. GREGORY, Defendant and Appellant.

[Opinion certified for partial publication.*]

* See footnote 2, *post*, page 669.

---

**COUNSEL**

William Flenniken, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Jane N. Kirkland and Judy Kaida, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

SIMS, J.—Defendant, a doctor of osteopathy, was convicted of seven felony counts of Medi-Cal fraud in violation of Welfare and Institutions Code section 14107.[1] (Further undesignated statutory references are to the Welfare and Institutions Code.) He was prosecuted for knowingly submitting false information for the purpose of obtaining greater compensation than that to which he was legally entitled for furnishing services.

Defendant appeals contending (1) Medi-Cal regulations are void for vagueness because they failed to apprise him that his method of determining the appropriate payment for his services was wrong; (2) the trial court erroneously instructed the jury on the elements of the crime; (3) the trial court erred in refusing a jury instruction on mistake of fact as a defense; (4) the trial court erred in failing to give sua sponte a jury instruction defining "knowingly"; and (5) irrelevant evidence of uncharged acts was improperly admitted.

In this published portion of the opinion,[2] we reject his vagueness challenge. We also conclude the trial court properly declined to give a special instruction defining "knowingly." In an unpublished portion, we reject his remaining contentions. We shall therefore affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

From January 1986 through June 1987, defendant developed a thriving medical practice in Stockton. On an average day, defendant saw an average of 60 patients and sometimes as many as 110 patients. Sometimes several patients were seen at once.

Most of his patients were Southeast Asians and required interpreters, provided by defendant. Most patients were Medi-Cal beneficiaries. Half of his patients were new patients. Defendant paid independent contractors

---

[1] Welfare and Institutions Code section 14107 provides: "Any person who, with intent to defraud, presents for allowance or payment any false or fraudulent claim for furnishing services or merchandise, knowingly submits false information for the purpose of obtaining greater compensation than that to which he is legally entitled for furnishing services or merchandise, or knowingly submits false information for the purpose of obtaining authorization for furnishing services or merchandise under this chapter or Chapter 8 (commencing with Section 14200) is punishable by imprisonment in the county jail not longer than one year or in the state prison, or by fine not exceeding five thousand dollars ($5,000), or by both such fine and imprisonment.

"The enforcement remedies provided under this section are not exclusive and shall not preclude the use of any other criminal or civil remedy."

[2] Pursuant to rule 976.1 of the California Rules of Court, all portions of this opinion shall be published except parts II.B, II.C, and III of the Discussion.

(contract drivers) to transport patients to his office. Patients generally spent five minutes in the examination room before being sent to the adjoining pharmacy or to defendant's laboratory for testing.

In the summer of 1986, defendant's office manager told him that Medi-Cal would not approve of the way he conducted his practice. Shortly thereafter the employment relationship ended, and defendant learned the office manager had complained to the county health department.

In December 1986, Ken Baumgarten, then senior investigator for the Department of Justice Bureau of Medi-Cal Fraud, pretending to be a financial investor in medical practices, met with defendant to discuss a possible partnership in defendant's clinic. Defendant stated he was in California to make enough money to take back to Utah, because Utah did not have a comparable Medi-Cal program, and defendant could make more money here in one month than he could in an entire year in Utah.

On January 6 and 7, 1987, Baumgarten returned to defendant's office and observed defendant as he treated 14 patients. Defendant's convictions resulted from Medi-Cal claims submitted for treatment of the patients observed by Baumgarten. The examinations (and consequent diagnoses) of patients involved in the seven counts of which defendant was convicted were described by Baumgarten and Dr. David Schneider, a physician and auditor for the Audits and Investigations Division of the State of California Department of Health, as follows: Patient Samnang T. (count II) was in the examining room simultaneously with three other patients. Defendant looked at Samnang's throat for 30 seconds but did not touch Samnang's body. Defendant spent a total of four to five minutes examining all four of the patients in the room. Defendant diagnosed Samnang as having "dermatitis." Such a diagnosis retires an examination of the patient's entire body and would take the average doctor a minimum of 20 minutes to perform; the examination could not be performed in 30 seconds.

Patients Keo T. (count V), Siem K. (count VI), and Khean K. (count VII) were in the examining room simultaneously with one other patient. Defendant remained approximately six feet away from Keo, observed Siem's mouth for approximately three seconds, and observed Khean's throat for approximately two seconds. Defendant did not touch any of the patients' bodies. He spent less than four minutes examining all four patients.

Defendant diagnosed Keo T. as having "conjunctivitis." A doctor could not make such a diagnosis without examining the patient.

Defendant diagnosed Siem K. as having "acute bronchitis and tonsillitis." A doctor could not make such a diagnosis based upon an examination that lasted only a few seconds.

With regard to patient Khean K. (count VII), a doctor could not perform a standard intermediate examination in two seconds.

Defendant spent less than two minutes examining the throat of patient Yik Y. (count X). He did not touch Yik's body. Defendant diagnosed Yik as having acute "bronchitis, sinusitis." It would be impossible for a doctor to make such a diagnosis based solely upon a brief observation of the patient's throat.

Patient Mary T. (count XII) never entered the examining room. As Mary stood in the doorway of the examining room, defendant refilled her Tylenol prescription. Defendant diagnosed Mary as having "acute bronchitis, rhinitis." A doctor could not make such a diagnosis without examining the patient.

In the examining room, defendant remained approximately six feet away from patient Roeum R. (count XIV) and spent approximately two minutes with her. Defendant diagnosed Roeum as having "chronic constructive pulmonary disease and asthma." A doctor could not make such a diagnosis without examining the patient.

For each patient, defendant submitted a claim on a form supplied by Medi-Cal for an "intermediate examination." The claim form required no description of the services rendered, other than "intermediate examination" and designation of a numerical billing code. The Medi-Cal program paid each claim.

Dr. Schneider testified that physicians who participate as health care providers in the Medi-Cal Program receive a Medi-Cal "billing guide." Defendant acknowledged he had received the "billing guide." The "billing guide" states that an "intermediate examination" consists of "A level of service such as a complete history, an examination of one or more organ systems, or an in depth counseling, or discussion of the findings, but not requiring a comprehensive examination of the patient as a whole." We shall examine the "billing guide" in more detail later.

Defendant testified. He agreed an "intermediate examination" should take 15 minutes but claimed he believed that could include time spent by his staff. His bilingual staff performed such services as assisting patients in completing the case history forms, which took 5 to 10 minutes, so that total

time spent by him and his staff approximated 15 minutes per patient. He believed his interpretation met the criteria for an "intermediate examination." The Medi-Cal program never advised him of any minimum time requirement or that his presence was required throughout that time. Defendant testified he was able to treat an average of 60 patients per day because he had "very competent help." Defendant said the Medi-Cal investigator was not present during the entire examinations. Defendant testified he never submitted false claims to the Medi-Cal Program with an intent to defraud.

## DISCUSSION

### I. THE ASSERTED VAGUENESS IN MEDI-CAL PAYMENT RULES WAS PROPERLY ADJUDICATED AS A QUESTION OF FACT IN THE TRIAL COURT

Defendant contends, "The Medi-Cal regulations which [defendant] violated were void for vagueness because they failed to apprise [defendant] that his method of determining the proper payment category for services rendered was wrong." The People contend (1) defendant waived the issue by not tendering it in the trial court and (2) defendant has no standing to challenge the "regulations."

Both defendant and the People fail to appreciate the way defendant's vagueness challenge was appropriately tendered and resolved in the trial court. Because of this shared misapprehension, the contentions of both defendant and the People are wrong.

In order to show why this is so, it is first necessary to explain how payment for services is authorized by Medi-Cal.

Section 14105 authorizes the director of the state Department of Health to adopt rules and regulations for rates of payment for health care services. (§ 14105, subd. (a).) The pertinent Medi-Cal regulation is found in section 51503 of title 22 of the California Code of Regulations.[3] Medi-Cal rates of

---

[3] California Code of Regulations, title 22, section 51503 provides in relevant part:

"(a) For services rendered on or after September 22, 1976, except as otherwise provided, reimbursement for physician services shall be the usual charges made to the general public not to exceed the maximum reimbursement rates listed in this section for each procedure performed by a physician.

"(b) Except as set forth in (d), (e), (f), (g), (i) and (j), the maximum reimbursement rates for physician services shall be the unit value assigned to a given procedure listed in the '1969 California Relative Value Studies,' fifth edition, published by the California Medical Associa-

payment are calculated according to a schedule based on the usual charges made to the general public, not to exceed a formula based on various

tion, multiplied by the following dollar conversion factors corresponding to the appropriate sections of the '1969 Relative Value Studies.'

| "1969 Relative Value Studies "Sections | Conversion Factors |
|---|---|
| "Medicine | |
| "Procedure codes 90000 through 90020, 90030 through 90080, and 90088 through 90470 | $ 0.92 |
| "Procedure codes 90021 through 90024 and 90081 through 90084 | 1.01 |
| "Procedure codes performed in a hospital emergency room | 0.86 |
| "All other codes | 0.82 |
| | |
| "Anesthesia | 14.01 |
| "Surgery | |
| "Procedure codes 59400 through 59430 | 112.47 |
| "Procedure codes 59500 through 59581 | 82.16 |
| "Procedure codes 56000 through 59305 | 50.67 |
| "Procedure code 59850 | 26.35 |
| "Procedure code 59860 | 34.46 |
| "Procedure codes performed in a hospital emergency room | 38.78 |
| "All other codes | 37.23 |
| | |
| "Radiology/Nuclear medicine | 3.82 |

"(c) As used in (b), a given procedure listed in the '1969 California Relative Value Studies' means those procedures which are a benefit of the Medi-Cal program as determined by the Department.

"(d) The maximum reimbursement for 'By Report', 'Service Items', or procedures not listed in the '1969 California Relative Value Studies' shall be based upon a review of such procedures to determine their relationship to other procedures for which unit values are established.

"(e) In addition to the maximum reimbursement rates listed in (b), the maximum reimbursement for procedure modifiers as listed in each section of the above '1969 Relative Value Studies', if determined to be an appropriate Medi-Cal program benefit, shall be the unit value assigned to the modifier, multiplied by the appropriate conversion factor listed in paragraph (b).

" . . . . . . . . . . . . . . . . . .

"(k) The Medi-Cal program, through its intermediary, will pay allowable Medi-Cal rates for direct patient care services in a teaching setting when directly provided by teaching physicians only when such services are provided and billed in accordance with program policies and regulations of the Department of Health Services and when:

"(1) They are performed for necessary treatment of the patient;

"(2) They are not an exercise of teaching supervision without direct patient care services being provided;

"(3) They do not duplicate any medical services billed by any other provider; and

"(4) The teaching physician is not on salary or contract to the hospital for the direct patient care services provided.

"No professional fees are payable for services provided independently by residents or students in a teaching setting."

medical procedures described in the 1969 California Relative Value Studies (Relative Value Studies), published by the California Medical Association and applied throughout the medical community. (*Ibid.*)

The Medi-Cal "billing guide" that defendant received is, in fact, a copy of the Relative Value Studies. We shall refer to it as such. The pertinent page from the Relative Value Studies is set out in appendix A, *post.* There, definitions of "intermediate examination" and of unit values for such examinations for new and established patients may be found. (*Ibid.*)

Although defendant purports to challenge Medi-Cal "regulations," it appears that his vagueness challenge is aimed at the asserted failure of the Relative Value Studies to define "intermediate examination" with sufficient precision. He argues, ". . . the regulations gave no notice of the fact that no claim for an intermediate examination could be filed absent 15-20 minutes of direct physician involvement. From this lack of notice, a denial of due process is established." In support of this argument, defendant cites (among other cases) *Connally* v. *General Construction Co.* (1925) 269 U.S. 385 [70 L.Ed. 322, 46 S.Ct. 126] for the following venerable rule: "That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law. And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." (269 U.S. at p. 391 [70 L.Ed. at p. 328].)

Defendant's vagueness argument assumes he was convicted of violating a Medi-Cal regulation or the rules of the Relative Value Studies. However, he was not. ■ ■ ■ ■ Rather, he was convicted of presenting false information to Medi-Cal with the specific intent to defraud in violation of section 14107.[4] As we shall explain, the fact that defendant was prosecuted and convicted of fraud affects the role played by the challenged rules of the Relative Value Studies and the way a vagueness challenge is adjudicated.

If defendant had been convicted merely violating a Medi-Cal rule, it is clear that, contrary to the People's contention, defendant would have standing to assert the rule's vagueness. ■ Thus, a governmental employee whose employment is terminated for violation of a rule has standing to

---

[4]Defendant does not appear to challenge section 14107 on vagueness grounds. In any event, the statute, which requires the specific intent to defraud, is not unconstitutionally vague. (*People* v. *Building Maintenance etc. Assn.* (1953) 41 Cal.2d 719, 724 [264 P.2d 31]; *People* v. *Cobbs* (1975) 53 Cal.App.3d 937, 942 [126 Cal.Rptr. 494].)

challenge the rule's vagueness. (*Cranston* v. *City of Richmond* (1985) 40 Cal.3d 755, 763-764 [221 Cal.Rptr. 779, 710 P.2d 845]; see *Wheeler* v. *State Bd. of Forestry* (1983) 144 Cal.App.3d 522 [192 Cal.Rptr. 693].) A fortiori, a citizen who faces imprisonment for violating a rule has standing to attack the rule on vagueness grounds. The People's reliance on *Goldin* v. *Public Utilities Commission* (1979) 23 Cal.3d 638 [153 Cal.Rptr. 802, 592 P.2d 289] is misplaced. There the court concluded that telephone subscribers had no standing to assert the vagueness of a rule of the Public Utilities Commission defining conditions for the termination of telephone service. (*Id.* at pp. 658-659.) However, the court expressly noted that no criminal penalties were at issue. (*Id.* at p. 659.)

Moreover, if defendant had simply been convicted of violating a Medi-Cal rule, this court would adjudicate the vagueness issue *as a question of law,* as defendant asks us to do. (See, e.g., *Kolender* v. *Lawson* (1983) 461 U.S. 352, 357-561 [75 L.Ed.2d 903, 909-911, 103 S.Ct. 1855]; *Grayned* v. *City of Rockford* (1972) 408 U.S. 104 [33 L.Ed.2d 222, 92 S.Ct. 2294]; *Papachristou* v. *City of Jacksonville* (1972) 405 U.S. 156 [31 L.Ed.2d 110, 92 S.Ct. 839]; *People* v. *Superior Court (Caswell)* (1988) 46 Cal.3d 381 [250 Cal.Rptr. 515, 758 P.2d 1046]; *Cranston* v. *City of Richmond, supra,* 40 Cal.3d 755; *Burg* v. *Municipal Court* (1983) 35 Cal.3d 257 [198 Cal.Rptr. 145, 673 P.2d 732]; *People* v. *Mirmirani* (1981) 30 Cal.3d 375 [178 Cal.Rptr. 792, 636 P.2d 1130]; see generally Note, *The Void-for-Vagueness Doctrine in the Supreme Court* (1960) 109 U.Pa.L.Rev. 67.) ■ In determining whether the rule was sufficiently certain, we could consider a variety of factors, including whether the language has a common law meaning, or a meaning known to a particular class, or whether extant case law may supply meaning, and so forth. (1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Introduction to Crimes, §§ 46-49, pp. 57-58.) Our task would be to determine whether the rule provided "fair notice" to a person of common intelligence. (*Colautti* v. *Franklin* (1979) 439 U.S. 379, 390 [58 L.Ed.2d 596, 606, 99 S.Ct. 675]; *Rose* v. *Locke* (1975) 423 U.S. 48, 49 [46 L.Ed.2d 185, 188, 96 S.Ct. 243]; *Smith* v. *Goguen* (1974) 415 U.S. 566, 572, fn. 8 [39 L.Ed.2d 605, 611, 94 S.Ct. 1242]; *Burg* v. *Municipal Court, supra,* 35 Cal.3d at p. 269, fn. 15.) Defendant's actual knowledge of the rule would not be controlling, because "due process has never been interpreted so strictly as to require the 'actual' notice [of the meaning of a statute] . . . ." (*Burg* v. *Municipal Court, supra,* 35 Cal.3d at p. 269, fn. 15.) Rather, the rule would pass constitutional muster if its meaning could be ascertained by a hypothetical person of common intelligence, because " '[r]easonable certainty, in view of the conditions, is all that is required, . . .' " (*People* v. *Hallner* (1954) 43 Cal.2d 715, 720 [277 P.2d 393], quoting *People* v. *Kennedy* (1937) 21 Cal.App.2d 185, 193 [69 P.2d 224].)

Here, as we have noted, defendant was not charged with or convicted of merely of violating a Medi-Cal regulation or rule. Rather, he was charged with and convicted of criminal fraud in violation of section 14107. ■ ■■
■■ Section 14107 specifies three ways the statute may be violated:[5] (1) presenting for allowance or payment any false or fraudulent claim for furnishing services or merchandise; (2) knowingly submitting false information for the purpose of obtaining greater compensation than that to which he is legally entitled for furnishing services or merchandise; or (3) knowingly submitting false information for the purpose of obtaining authorization for furnishing services or merchandise. (See fn. 1, *ante.*) All three proscribed acts require the specific intent to defraud. (*Ibid.*)

In this case, the theory of prosecution was premised upon the second way of violating the statute, and the jury was instructed accordingly.[6] The statute and the instructions required the jury to find that defendant actually knew the authorized definition of "intermediate examination." That knowledge is required in several ways by the plain language of section 14107. First, the statute applies to a claimant who "knowingly submits false information." Where, as here, the information submitted is simply an unembellished description of a medical procedure ("intermediate examination"), knowledge of falsity necessarily entails knowledge of the definition of the authorized procedure. Second, the statute requires that the false information be submitted "for the purpose of obtaining greater compensation than that to which [a claimant] is legally entitled for furnishing services." In order to have the prescribed purpose, a claimant must necessarily have knowledge of the legal entitlement. Finally, knowledge of the authorized Medi-Cal entitlement is implicit in the statutory requirement that defendant have the specific "intent to defraud." ■ "Intent to defraud is an intent to commit a fraud." (*People* v. *Griffith* (1953) 120 Cal.App.2d 873, 881 [262 P.2d 355].) " 'Fraud' and 'dishonesty' are closely synonymous. Fraud is defined as 'a dishonest stratagem.' (Webster's Third New Internat. Dict. (1961) p. 904.) It 'may consist in the misrepresentation or the concealment of material facts' (*Koch* v. *Williams* (1961) 193 Cal.App.2d 537, 541 [14 Cal.Rptr. 429]), or a statement of fact made with 'conscious[ness] of [its] falsity.' (*People* v. *Davis* (1952) 112 Cal.App.2d 286, 298 [246 P.2d 160].)" (*Fort* v. *Board of Medical Quality Assurance* (1982) 136 Cal.App.3d 12, 19 [185 Cal.Rptr. 836].) Defendant could not have submitted a claim with the

---

[5] Although section 14107 describes three ways the statute may be violated, the statute defines a single criminal offense, not several different crimes. (*People* v. *Hathaway* (1972) 27 Cal.App.3d 586, 593-594 [103 Cal.Rptr. 638].)

[6] Thus, the jury was instructed in pertinent part that defendant could be convicted only upon proof that he "*knowingly* presented or caused to be presented for allowance or for payment a claim for the purpose of obtaining greater compensation *than that to which he is legally entitled for furnishing services.*" (Italics added.)

intent to defraud unless he was conscious of its falsity as measured by the legal entitlement. For example, he could not have been convicted under the statute for having made a mistake.

This conclusion is not at odds with the conclusion we reached in *Brown* v. *State Department of Health* (1978) 86 Cal.App.3d 548 [150 Cal.Rptr. 344]. In that case, as pertinent here, Dr. Brown contested discipline imposed by the Board of Medical Quality Assurance, which found he had submitted false bills to Medi-Cal. The bills certified that Dr. Brown had personally performed the services when, in fact, the services had been performed by other physicians. In some instances, Dr. Brown had supervised services performed by others. In other instances Dr. Brown had submitted bills where other physicians had performed "courtesy deliveries" of babies of Dr. Brown's regular patients where Dr. Brown was unavailable. (*Id.* at p. 553.)

The administrative law judge (ALJ) found Dr. Brown knowingly signed claim forms falsely stating he had performed the services. The ALJ also "found that there was no intent on the part of Dr. Brown to mislead or defraud the Medi-Cal program on any of the claims presented and that such claims were presented under the mistaken belief that such charges were permitted and authorized." (86 Cal.App.3d at p. 553.)

On appeal, Dr. Brown contended imposition of discipline was inappropriate because he had no intent to defraud or deceive the Medi-Cal program. (86 Cal.App.3d at p. 554.) We rejected his contention on the ground discipline could be based on his false certification that he had personally performed services. (*Id.* at p. 556.) We reasoned as follows: "Business and Professions Code section 2411 states that it is unprofessional conduct to 'knowingly' make or sign a certificate which 'falsely represents' a state of facts. Penal Code section 7, subdivision 5 defines 'knowingly' as importing only knowledge that the facts exist which bring the act or omission within the provisions of the code. It does not require any knowledge of the unlawfulness of such act or omission. While Business and Professions Code section 2411 is not a penal statute, the Penal Code definition is nonetheless persuasive in determining the intent of the Legislature in using that word in other statutes. California case law has long held that the requirement of 'knowingly' is satisfied where the person involved has knowledge of the facts, though not of the law. (*Steinmetz* v. *Cal. State Board of Education* (1955) 44 Cal.2d 816, 822-823 [285 P.2d 617]; *People* v. *Burns* (1888) 75 Cal. 627, 630-631 [17 P. 646]; *People* v. *Autterson* (1968) 261 Cal.App.2d 627, 632 [68 Cal.Rptr. 113]; *People* v. *McCree* (1954) 128 Cal.App.2d 196, 202-203 [275 P.2d 95].) Appellant cites no authority and we have found none which requires that the use of the word 'knowingly' be interpreted to include 'with intent to deceive.'

"... . . . . . . . . . . . . . . . . . . . .

"In *United States* v. *Chicago Express* (7th Cir. 1956) 235 F.2d 785, cited by appellant, the court held that it requires knowledge of a regulation in order to ' "knowingly violate . . . the Regulation." ' (235 F.2d at p. 786; in accord see *St. Johnsbury Trucking Company* v. *United States* (1st Cir. 1955) 220 F.2d 393, 395.) The logic of these cases is simple and straightforward. To knowingly violate a regulation one must have knowledge of the regulation." (*Brown, supra,* 86 Cal.App.3d at pp. 554-555; see also *Fort* v. *Board of Medical Quality Assurance, supra,* 136 Cal.App.3d at pp. 21-22.)

Although in *Brown* we found the Penal Code definition of "knowingly"[7] persuasive as applied to Business and Professions Code section 2411, we do not find it persuasive as applied to the part of section 14107 at issue here. As we have recounted, section 14107 as pertinent expressly requires knowing submission of a claim "for the purpose of obtaining greater compensation than that to which he is legally entitled . . . ." Knowledge of legal entitlement is necessarily required as a measure of "greater compensation than that to which he is legally entitled." Moreover, as we have pointed out, section 14107 requires a specific intent to defraud. Thus, the making of a false statement, in and of itself, does not violate the statute; rather, a violation requires knowledge of the wrongfulness of the false statement. ▮ In short, the specific statutory context of section 14107 requires our rejection of the Penal Code definition of "knowingly," which would preclude a requirement that a defendant have knowledge of the unlawfulness of a claim for compensation. Penal Code section 7 says its definitions apply only to the Penal Code. (See fn. 7, *ante.*) There is no rule of law that necessarily requires the same meaning to be given the same word used in different statutes relating to essentially different matters. (*Lampley* v. *Alvares* (1975) 50 Cal.App.3d 124, 128 [123 Cal.Rptr. 181]; *Lambert* v. *Conrad* (1960) 185 Cal.App.2d 85, 95 [8 Cal.Rptr. 56].)

Here, the situation is like that in *United States* v. *Chicago Express* (7th Cir. 1956) 235 F.2d 785, distinguished in *Brown,* where knowledge of a regulation was found necessary to violate a federal statute making it a crime to knowingly violate the regulation. (See also *St. Johnsbury Trucking Company* v. *United States, supra,* 220 F.2d 393, 395.)

▮ Thus, whether defendant submitted claims with the prescribed knowledge and intent depended on whether he knew the services for which

---

[7] Penal Code section 7 provides in relevant part: "The following words have in this code the signification attached to them in this section, unless otherwise apparent from the context:

" . . . . . . . . . . . . . . . . . . . . .

"5. The word 'knowingly' imports only a knowledge that the facts exist which bring the act or omission within the provisions of this code. It does not require any knowledge of the unlawfulness of such act or omission."

he submitted claims were not "intermediate examinations" within the meaning of Medi-Cal payment rules. The question of the vagueness of the Medi-Cal rules was therefore properly at issue *as a question of fact* probative on the question of defendant's intent. (See, e.g., *People* v. *Benson* (1962) 206 Cal.App.2d 519, 529 [23 Cal.Rptr. 908], and authorities cited [in case of criminal fraud, questions of knowledge and intent are for the jury].) It was open for defendant to defend on the ground he had no knowledge of the falsity of his claims and had no intent to defraud because the vagueness of the Medi-Cal rules precluded him from knowing he was making unauthorized claims. And, indeed, that was precisely his defense. The point to be recognized is that, under the part of section 14107 at issue here, the vagueness of the Medi-Cal rules was properly adjudicated at trial not as a question of law but rather as a question of fact bearing on defendant's intent.

This does not mean that the asserted vagueness of the Relative Value Studies is immune from judicial review. However, the review is different from that undertaken upon a legal challenge to the vagueness of a statute or regulation. Because here the vagueness of the Relative Value Studies is adjudicated as a question of fact, our task is to determine whether substantial evidence adduced in the trial court supports the jury's conclusion defendant knew he was submitting claims for unauthorized services. ■ In determining whether substantial evidence supports the conviction, we "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

■ Abundant evidence shows defendant knew his claims for "intermediate examinations" were unauthorized and fraudulent.

Defendant admitted at trial that he knew an "intermediate examination" should take at least 15 minutes. The only viable question was whether he knew the examination had to be performed by a physician.

However, the Relative Value Studies shows the "intermediate examination" is to be conducted personally by the physician. Thus, levels of service are graded according to the involvement of the physician. (See appen. A, *post*.) A "minimal" examination is one "not necessarily requiring the presence of a physician." (*Ibid*.) By inference, higher levels of service "Limited," "Intermediate," "Extended," "Comprehensive," and "Unusually Complex" all require more than a minimal effort of a physician. This is also

made clear by the designations of unit values for office visits, which replicate the levels of service described above, and which are described as, "Those services *performed by a physician*. . . ." (*Ibid.*, italics added.)

Defendant admitted he had received the Relative Value Studies. Moreover, his claims for payment used the numerical codes for intermediate examinations set forth in the studies. The jury could therefore infer he was familiar with the studies' definitions.

In addition, Dr. Schneider testified that "intermediate examination" is a term of art understood throughout the medical community, rather than a Medi-Cal term. According to Dr. Schneider an "intermediate examination" means the same thing regardless of whether the patient is Medi-Cal or private. (See appen. A, *post.*) He stated that the physician's presence is required during an "intermediate examination," that it would take a physician an average of 20 minutes and no less that 15 minutes to perform the examination and that it would be impossible for a physician to perform the examination without touching the patient. He testified a reasonable physician would realize that, by definition, an "intermediate examination" could not be performed in 90 seconds.

Finally, the fact that defendant's diagnoses could not reasonably be made based upon the examinations afforded his patients strongly suggests defendant's intent was fraudulent.

The foregoing evidence constitutes substantial evidence that defendant knew the examinations he performed were not "intermediate examinations" as defined by Medi-Cal and that he knowingly submitted false and fraudulent claims for services in violation of section 14107.

## II. THE TRIAL COURT DID NOT PREJUDICIALLY ERR IN INSTRUCTING THE JURY

### A. *Jury Instruction Defining "Knowingly"*

Defendant contends the trial court had a sua sponte duty to define "knowingly" for the jury. Defendant contends "knowingly" has a technical meaning peculiar to the law, so that the trial court had a sua sponte duty to define "knowingly." (See *People* v. *Valenzuela* (1985) 175 Cal.App.3d 381, 393 [222 Cal.Rptr. 405] [requiring definition of "assault"].) Defendant contends the trial court should have given CALJIC No. 1.21, which reads in pertinent part as follows: "The word 'knowingly,' means with knowledge of the existence of the facts in question. Knowledge of the unlawfulness of any act or omission is not required."

CALJIC No. 1.21 is based on Penal Code section 7. The instruction narrows the common definition of "knowingly" by excluding knowledge of the unlawfulness of an act. For reasons we have recounted, it would have been error to give this instruction. Defendant was entitled to have the jury understand the word "knowingly" according to its broader common meaning. That broader meaning allowed the jury to consider whether defendant knowingly presented a claim for payment for the purpose of obtaining greater compensation than that to which he was legally entitled. Since the jury was entitled to use the common meaning of "knowingly," no instruction on the meaning of the term was required sua sponte. (*People* v. *Anderson* (1966) 64 Cal.2d 633, 639 [51 Cal.Rptr. 238, 414 P.2d 366].)

II.B.-III.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

### DISPOSITION

The judgment is affirmed.

Sparks, Acting P. J., and Davis, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 17, 1990.

---

* See footnote 2, *ante*, page 669.

APPENDIX A

# MEDICINE

### Definitions
For the purpose of this section, the following definitions apply.

LEVELS OF SERVICE. Examinations, evaluations, treatment, counseling, conferences with or concerning patient preventive pediatric and adult health supervision, and similar services necessitate the wide variations in skill, effort an time required for the prevention, diagnosis and treatment of illness and the promotion of optimal health. Seven level are recognized:

| | |
|---|---|
| Minimal: | A level of service including injections, dressings, minimal care, etc., not necessarily requiring th presence of the physician. |
| Brief: | A level of service requiring a brief period of time, with minimal effort of the physician. |
| Limited: | A level of service requiring limited effort or judgment, such as abbreviated or interval histor limited examination or discussion of findings and/or treatment. |
| Intermediate: | A level of service such as a complete history and examination of one or more organ systems, or a in-depth counseling or discussion of the findings, but not requiring a comprehensive examinatio of the patient as a whole. |
| Extended: | A level of service requiring an unusual amount of time, effort or judgment but not a complet examination of the patient as a whole. |
| Comprehensive: | A level of service providing an in-depth evaluation of the patient. |
| Unusually Complex: | An unusually complex medical problem necessitating a comprehensive history and complet examination, extensive review of prior medical records, compilation and assessment of data. |

### TYPE OF PATIENT

New Patient: One new to the physician, office, or facility. The initial comprehensive history and examination nee not be done at the time of the first visit.

Established Patient: One known to the physician and/or whose records are normally available.

## Office Visits

Those services performed by a physician in his own office, or in an out-patient facility of a hospital, such as an out-patient clinic, examining or treatment room, etc. See 90500-90570 for emergency care; see 90088, 90751-90776 for preventive services.

### NEW PATIENT

Unit Value

(For visits that include provision of an asterisked surgical procedure, see Surgery ground rule 8.)

| | | |
|---|---|---|
| 90000 | *Brief* evaluation, history, examination and/or treatment | 5.9 |
| 90010 | Initial *limited* history and examination, including initiation of diagnostic and treatment program | 7.6 |
| 90015 | Initial *intermediate* history and examination, including initiation of diagnostic and treatment program | 10.5 |
| 90020 | Initial *comprehensive* history and examination, including initiation of diagnostic and treatment program | 17.5 |
| *90026 | An *unusually complex* medical problem, necessitating a comprehensive history and complete examination, extensive review of prior medical records, compilation and assessment of data, any age | BR† |

(For established patient, see 90086, 90087)

### ESTABLISHED PATIENT

Unit Valu

| | | |
|---|---|---|
| 90030 | *Minimal service*, e.g., injection, minimal dressing, blood pressure or weight check (independent procedure) | 2.( |
| | (For immunizations, see 90720-90729) | |
| 90040 | *Brief* examination, evaluation and/or treatment, same or new illness | 3.! |
| 90050 | *Limited* examination, evaluation and/or treatment, same or new illness | 5.: |
| 90060 | *Intermediate* examination, evaluation and/or treatment, same or new illness | 6.! |
| 90070 | *Extended* re-examination and/or re-evaluation | 8.: |
| 90080 | *Comprehensive* re-examination and/or re-evaluation | 13.( |
| | (For well child care, see 90751-90776) | |
| *90085 | *Comprehensive* re-examination or re-evaluation when complicated by chronically disabling condition | 16.( |

### DIAGNOSTIC PROBLEM OR CHALLENGE

A problem new to an established patient, requiring extended service and time, diagnostic acumen and skills (e.g., myopathy, metabolic disease, cardiovascular problem, tumor or collagen disease). (For new patient, see 90026)