[No. E008813. Fourth Dist., Div. Two. June 19, 1992.]

THE PEOPLE, Plaintiff and Appellant, v.
LARRY TAYLOR, Defendant and Respondent.

678

## COUNSEL

Dennis Kottmeier, District Attorney, and Joseph A. Burns, Deputy District Attorney, for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Theodara Berger, Assistant Attorney General, Richard Tom, Deputy Attorney General, Gary T. Yancey, District Attorney (Contra Costa), and Lauren R. Wixson, Deputy District Attorney, as Amici Curiae on behalf of Plaintiff and Appellant.

David L. McKenna, Public Defender, and David W. Negus, Chief Deputy Public Defender, for Defendant and Respondent.

## OPINION

**TIMLIN, J.**—Pursuant to Penal Code section 1238, subdivision (a)(1), the People appeal from a ruling by the trial court under Penal Code section 995 setting aside the one-count information the People had filed against defendant. The gist of the People's argument on appeal is that the trial court erroneously granted defendant's motion to set aside the information as a consequence of its (the trial court's) misinterpretation of the phrase "the disposal of any hazardous waste," as that phrase is used in the California Hazardous Waste Control Law (Health & Saf. Code, div. 20, ch. 6.5, beginning with § 25100) and, in particular, in Health and Safety Code section 25189.5, subdivision (a).[1] We agree. We shall conclude that the trial court's ruling on defendant's motion to set aside the information must be vacated and that the matter must be remanded to the trial court for reinstatement of the People's information and for further proceedings consistent with this opinion.

## FACTS[2]

From 1976 until the end of 1985, defendant and one Thomas Campbell were the primary owner/operators of a small company that manufactured printed circuit boards. The nature of the manufacturing business was such that various baths and rinses of acids, solvents and other chemical solutions were used to clean, etch and/or plate the circuit boards. After extended use in the manufacturing process, these various solutions would be reduced to liquid, toxic waste products containing, among other things, hazardous

---

[1]Unless otherwise indicated, references to specific statutory sections refer to sections of the Health and Safety Code. Section 25189.5, subdivision (a) is hereafter referred to as section 25189.5(a).

[2]Inasmuch as defendant's motion to set aside the People's information was granted after a preliminary hearing was held in the matter, most of the facts set forth in this opinion have been taken from the evidence adduced during that preliminary hearing.

concentrations of copper and lead. Typically, those waste products which could not be chemically "neutralized" and disposed of in the municipal sewer system were placed in sealed drums, labelled and stored outside on the leased premises of the manufacturing facility in a fenced-in area until such time as the company would pay an authorized hazardous waste hauler to remove the drums and transport them to a hazardous waste dump site.

At the end of 1985, due to a downturn in business, Campbell left the company and defendant assumed all of the managerial responsibility for running the business, including seeing to the disposal of the hazardous waste materials.

On June 12, 1986, a county environmental health specialist inspected the company's facilities. While carrying out his inspection, the specialist noted evidence of copper contamination in one of the buildings (blue staining on the floors, in drainage trenches cut into the floors and on the walls) as well as evidence of acid spillovers in the vicinity of some of the acid vats. The specialist also noted that there were "spent" materials stored in approximately 40 drums and located in the fenced-in area outside the buildings— none of which drums were properly labelled.[3] The specialist pointed out the waste management shortcomings concerning the drums to defendant.

By late in 1986, the company's business fortunes had fallen to such a low point that it had retained a third party business consultant to oversee its day-to-day financial operations. The company had very little cash on hand to pay its bills, including its rent. Finally, sometime between November 8, 1986, and November 12, 1986, the company's landlord served a three-day notice to pay rent or quit on the company. The company (by this point, as a practical matter, defendant) ceased to occupy the premises without paying any of the overdue rent.

On at least two different occasions during this same general period of time, November 3, 1986, and November 20, 1986, defendant contacted an authorized hazardous waste hauler to obtain a bid for removing and properly disposing of the drums of "spent" hazardous liquid wastes which had accumulated on the premises.

On November 24, 1986, the same county environmental health specialist who had five months previously inspected the company's facilities returned

---

[3]The applicable regulations concerning the storage of hazardous waste materials required that such drums be labelled with a hazardous waste label which would identify the contents of the drum as well as indicate the date on which the contents had first been stored in the drum. In general terms, and subject to certain specific exceptions, the regulations proscribed the "drum storage" of hazardous waste materials in other than authorized sites for any length of time in excess of 90 days.

to reinspect the same site. By this time, defendant had left the premises. The specialist found almost 200 drums, of various sizes, containing "spent" hazardous liquid wastes stored outside in the fenced-in storage area. Fewer than one-fourth of the drums were properly labelled with hazardous waste labels. Later testing showed that the drums contained hazardous waste liquids with dangerously high concentrations of copper and lead. The specialist returned once again to the premises on December 15, 1986, to observe a public auction which was being conducted to sell off the various materials and pieces of equipment which had been left behind when the company ceased to occupy the premises. (The company previously had pledged these materials and pieces of equipment as collateral for an operating business loan from a commercial lender, the repayment of which loan constituted the priority claim against the proceeds of the the public auction.) While there, the specialist noticed a large, open vat of chemicals inside the building. Upon testing, the liquid in the vat proved to be of such a highly acidic character as to qualify as a "hazardous" material. The specialist "taped off" the vat so that it could not be sold. The specialist returned to the premises yet again on December 19, 1986, to inspect the site yet further. At that time, the specialist once again noticed the chemical contamination and staining of the premises' floors, walls and floor trenches which he had first noticed some six months previously. Finally, on December 23, 1986, the specialist returned to the premises for the last time and observed that there were still approximately 200 drums of hazardous liquid waste materials located in the outside fenced-in area, only some 42 of which drums had been properly labelled with hazardous waste labels.

Eventually, the landlord of the premises, at his expense, removed all of the hazardous and contaminated materials from the site.

On September 12, 1988, the People filed a criminal complaint against defendant and Campbell, which complaint alleged that the two named defendants had violated section 25189.5(a) during the month of November 1986 by "knowingly dispos[ing] or caus[ing] the disposal of any hazardous waste, to wit: lead and copper at a facility which did not have a permit issued by the Department of Health Services."[4] After an extensive pre-

---

[4]In pertinent part, and as it was worded at the time of the offenses charged in the People's complaint (and subsequent information), section 25189.5 provided:

"(a) The disposal of any hazardous waste, or the causing thereof, is prohibited when the disposal is at a facility which does not have a permit from the department [the State Department of Health Services, see section 25111] issued pursuant to this chapter, or at any point which is not authorized according to this chapter.

"(b) Any person who is convicted of knowingly disposing or causing the disposal of any hazardous waste, or who reasonably should have known that he or she was disposing or

liminary hearing, defendant was held to answer on the charged offense.[5] On May 5, 1989, the People filed an information charging defendant with one count of a felony violation of section 25189.5(a), the charging language of the information being virtually identical with that which was used in the original complaint.

The matter was continued on the trial court's calendar for an extended period of time. Finally, on October 4, 1990, defendant filed a motion to set aside the People's information pursuant to section 995 of the Penal Code "on the grounds that he was held to answer without reasonable or probable cause." The gist of defendant's argument in support of his motion was that he could not be said to have "disposed" of any hazardous materials, as the meaning of that word is commonly understood, and that, if "disposed" is given some other meaning, the statute fails to meet constitutional muster by failing to clearly put persons on notice as to what conduct is being prohibited.

After extensive briefing and argument, the trial court granted defendant's motion to set aside the information, ruling as follows:

"[A]fter considering all of the evidence, the points and authorities that have been filed, and the language of the statute, this court has concluded that the 995 motion should be granted. The reason being that although there may be some evidence in this case of improper storing of hazardous wastes, I think that the use of the word "disposing" in the statute requires movement of waste to some location other than the premises on which it was created. And there is no evidence in this case that that occurred. The waste was still found on the premises. So that if anything occurred, it was improper storing rather than any disposition. And, therefore, the motion will be granted.

". . . . . . . . . . . . . . . . . . . . . . . . . . ."

causing the disposal of any hazardous waste, at a facility which does not have a permit from the department issued pursuant to this chapter, or at any point which is not authorized according to this chapter shall, upon conviction, be punished by imprisonment in the county jail for not more than one year or by imprisonment in the state prison for 16, 24, or 36 months." (Bracketed insert added.)

As it was worded at the time of the offenses charged in the People's complaint (and subsequent information), section 25113 defined "disposal" for the purposes of the California Hazardous Waste Control Law as follows: " 'Disposal' means to *abandon*, deposit, inter or otherwise discard waste." (Italics added.)

[5]Campbell "pled out" on the charge and received a reduction in the charged offense from a felony to a misdemeanor with an agreement that he would spend no more than 30 days in custody.

"I don't think there really was an abandonment in this case, at least not an intentional one. To some extent, due to circumstances beyond the control of the defendant because of the legal situation [in] which he found himself, he was excluded from the premises, so that he never had the opportunity to dispose of the accumulation in a proper manner while he still had legal access to the premises.

"I agree . . . that the so-called defense of lack of resources, et cetera, is not available if a prima facie case had been established here of a violation of the statute because I think there was a serious lack of planning in this case on the part of the defendant [and] his partners to dispose of the waste in a practical manner, but based on the situation that existed in November of . . . 1986, I don't see where there was either an improper disposition or was there an abandonment, as I understand those terms to have been used in the various statutes, and having been [intended] to be used by the Legislature."

The People appealed from the dismissal of their action, arguing that the trial court had misinterpreted section 25189.5(a). Inasmuch as the legal issue which is presented on appeal is the interpretation to be given a statute defining a crime, and in light of the fact that the issue appears to be one of first impression, we sought amicus curiae briefing on the issue from informed third parties. We received such briefing from the Attorney General, on behalf of the California Department of Toxic Substances Control, and from the District Attorney of Contra Costa County, on behalf of the California District Attorneys' Association.

Additional facts will be referred to, as needed, in the discussion which follows.

## DISCUSSION

### I.

### "ABANDONMENT" AS A TYPE OF "DISPOSAL" UNDER SECTION 25189.5(a)

■ Our primary task here is one of statutory interpretation—to determine whether the trial court correctly interpreted the word "disposal" as it is used in section 25189.5(a). ■ The general principles of statutory interpretation in criminal cases are well settled: "A court should 'ascertain the intent of the Legislature so as to effectuate the purpose of the law.' [Citations.] In determining such intent, the court 'turns first to the words themselves for the answer' [citations], giving to them 'their ordinary and generally accepted meaning' [citation]. Moreover, 'the various parts of a statutory

enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole.' [Citation.] Similarly, a statute should not be given a construction that results in rendering one of its provisions nugatory. [Citations.] Finally, we keep in mind that ' "[t]he defendant is entitled to the benefit of every reasonable doubt, whether it arise out of a question of fact, or as to the true interpretation of words or the construction of language used in a statute." ' [Citations.]" (*People* v. *Craft* (1986) 41 Cal.3d 554, 559-560 [224 Cal.Rptr. 626, 715 P.2d 585].)

 The trial court read a requirement of "movement of waste to some location other than the premises on which it was created" into the statutory meaning attending the Legislature's use of the word "disposal" in section 25189.5(a) notwithstanding the fact that section 25113 specifically defines "disposal" to include the *abandonment* of waste. (See fn. 4, *ante*.) On appeal, defendant argues that the trial court correctly understood the generally accepted meaning of "abandon" to involve the concept of "dumping"—that is, to "drop *elsewhere*." We disagree. The common understanding of "abandonment" is not limited in such fashion. It is a commonplace to speak of abandoning something where it lies—to leave behind something which is no longer wanted or which can no longer, for whatever reason, be retained.

Our understanding of the word "abandonment" (and our consequent understanding of the word "disposal") is reinforced by the 1989 amendments to section 25113 which were adopted by the Legislature. In 1989, section 25113 was amended to read:

"(a) 'Disposal' means *either* of the following:

"(1) The discharge, deposit, injection, *dumping*, spilling, leaking, or placing of any waste so that the waste or any constituent of the waste is or may be emitted into the air or discharged into or on any land or waters, including groundwaters, or may otherwise enter the environment.

"(2) The *abandonment* of any waste.

"(b) *The amendment* of the section made at the 1989-90 Regular Session of the Legislature does not constitute a change in, but *is declaratory of, the existing law*." (Italics added.)

It is clear, then, that under section 25113 abandonment is something different than dumping and that an abandonment of waste does not require some sort of affirmative relocation of that waste. An abandonment of waste under section 25113 is simply the permanent and intentional surrendering of

dominion and control over that waste; such an abandonment connotes a final act of severing or terminating a possessory and/or controlling interest in hazardous waste—and the connotation applies irrespective of the fact that, prior to the act of abandonment, the possessor of the hazardous waste had properly stored the waste on the premises at which it was eventually abandoned. In this case, defendant is alleged to have committed just such an abandonment with respect to the drums of hazardous waste liquids.[6]

Finally, we note that the interpretation we here give to the "abandonment" aspect of the word "disposal" in section 25189.5(a) is consistent with the expressed legislative intent in enacting the California Hazardous Waste Control Law: "In order to protect the public health and the environment and to conserve natural resources, it is in the public interest to establish regulations and incentives which ensure that the generators of hazardous waste employ technology and management practices for the safe handling, treatment, recycling, and destruction of their hazardous wastes prior to disposal." (§ 25101(a).) Any statutory interpretation of section 25189.5(a) which would countenance a hazardous waste generator leaving behind almost 200 drums of hazardous liquid waste without providing for their safe disposal would *not* be consistent with the Legislature's intent and purpose in enacting the California Hazardous Waste Control Law. Although hazardous waste might be properly labelled and securely stored at the time of its abandonment, the ever-present possibility that, with the passage of time, the containers of waste would be breached by vandals, by the effects of weather and/or by any one of a number of different sorts of natural disasters, resulting in the waste being discharged into the environment, militates against an interpretation of "disposal by abandonment" which would require that the meaning of "abandonment" include the elements of "discharge into the environment" and "movement from the existing place of storage." Such an interpretation would be clearly contrary to the protective public policy underlying the California Hazardous Waste Control Law.

---

[6]The People have noted that the vat of acid which was left behind inside one of the manufacturing buildings and the contaminated floors and walls of the manufacturing buildings could also arguably constitute "abandoned" (and, thus, "disposed of") hazardous materials supporting the charging allegations set forth in the criminal complaint and subsequent information. Without deciding one way or the other whether the People are correct in this, we have focused our attention in this opinion on the drums of hazardous liquid waste for the following reasons:

(1) The complaint and information define the hazardous wastes at issue in the case as being copper and lead—and there is no evidence that either one was in the acidic liquid which was left behind in the open vat;

(2) While there is evidence that there was copper contamination in the floors and walls of the manufacturing buildings, there is a possibility that this was caused (at least in part) by the occupants of those buildings who preceded defendant's company; and

(3) There is strong and clear evidence that the hazardous liquid wastes contained in the drums had a high copper and lead content.

## II.

### "IMPOSSIBILITY" AS A DEFENSE

During the trial court's hearing on defendant's Penal Code section 995 motion, defendant argued two different types of "impossibility" defenses with regard to defendant's alleged violation of section 25189.5(a): (1) A "legal impossibility"—that is, once defendant was evicted from the manufacturing premises, he had no legal means of access to the premises to see to a lawful removal and riddance of the drums of hazardous waste; and (2) a "financial impossibility"—that is, defendant simply did not have the means, the finances, to have the drums hauled to an authorized hazardous waste disposal site by an authorized hazardous waste hauler. The trial court arguably found some merit in the "legal impossibility" argument, but rejected the "financial impossibility" argument. Defendant has renewed both arguments before this court. We will address each of them in turn.

### A. "Legal Impossibility" as a Defense to Compliance With Section 25189.5(a).

 We are not persuaded by the trial court's position that there was no abandonment of waste in this case because defendant did not "really" intend to abandon—that he was forced to leave the waste materials behind as a consequence of his having been told by his landlord to leave the manufacturing premises if he did not timely pay his overdue rent. As noted above, defendant has taken up this position on appeal—twisting section 25189.5(a)'s criminal *prohibition* against improper hazardous waste disposal into an "*affirmative* duty" *not* to dispose of hazard waste improperly and then arguing that a failure to perform a duty is excused by impossibility.

Both the People and defendant have expended a considerable amount of time and energy in arguing whether defendant was, in fact, "free" to return to the manufacturing premises to oversee a lawful removal of the drums of hazardous waste. However, given the limited nature of our task in reviewing the granting of a Penal Code section 995 motion, we need not resolve this argument: "[I]n proceedings under section 995 it is the magistrate who is the finder of fact; the superior court has [no power to judge credibility, resolve conflicts, weigh evidence, and draw inferences], and sits merely as a reviewing court; it must draw every legitimate inference in favor of the information, and cannot substitute its judgment as to the credibility or weight of the evidence for that of the magistrate. [Citation.] On review by appeal or writ, moreover, the appellate court in effect disregards the ruling of the superior court and directly reviews the determination of the magistrate

holding the defendant to answer. [Citations.]" (*People* v. *Laiwa* (1983) 34 Cal.3d 711, 718 [195 Cal.Rptr. 503, 669 P.2d 1278].) ▮ Our role here, then, is simply to ascertain whether the magistrate made a factual finding as to the alleged "legal impossibility" of defendant's being able to arrange for and oversee the lawful removal and riddance of the drums by virtue of his being excluded from the premises, and then to determine whether that finding has evidentiary support in the preliminary hearing record.

At the close of the preliminary hearing, the magistrate stated: "The Court is persuaded that if the defendant was serious about getting into the premises for purposes of removing the hazardous waste and contaminated materials, he would have had no difficulty." This finding by the magistrate is clearly supported by the testimony given during the preliminary hearing by the landlord to the effect that defendant had been free to reenter the premises even after he had left it pursuant to the notice to pay rent or quit. This finding by the magistrate was further supported by the testimony of one of the landlord's employees to the effect that the landlord's business records reflected that defendant had had a conversation with the landlord after he (defendant) had vacated the premises and had represented that he intended to see to the removal of the hazardous materials from the manufacturing site by no later than December 19, 1986.[7]

The above serves to defeat any argument that a "legal impossibility" argument should have prevailed during the trial court's hearing on defendant's Penal Code section 995 motion.

B. *"Financial Impossibility" as a Defense to Compliance With Section 25189.5(a).*

▮ Neither the magistrate nor the trial court agreed with defendant's argument that his financial inability to hire an authorized hazardous waste hauler to remove the hazardous materials from the manufacturing premises was a defense to the criminal charge brought against him. Defendant has renewed his argument before this court—but it is similarly unavailing here.

---

[7]Given the magistrate's factual finding on the issue of whether defendant had had legal access (or, at least, was permitted *actual* access) to the premises for the purpose of arranging for and overseeing the lawful removal and riddance of the hazardous waste, we need not, and therefore do not, resolve in this opinion the issue of whether a "legal impossibility" defense such as that which has been asserted by defendant would, or could, ever be available as a matter of law to a criminal defendant charged under section 25189.5(a).

Defendant has cited no California authority for his position. Instead, defendant relies on several decisions from other states concerning a defendant's failure to make legally required payments and on legal treatises which argue that the impossibility (of whatever sort) of doing something negates personal culpability in omitting to do that thing, and that personal culpability is an element of crimes of *omission*. Defendant's authorities are inapposite because section 25189.5(a) defines a crime of *commission*, not *omission*. Section 25189.5(a) prohibits improper "disposal"—an affirmative act which is *committed* (even if the act which is committed is "disposal by abandonment"). Defendant's efforts to cast section 25189.5(a) as a statute which criminalizes an omission to perform the "duty" of properly disposing of hazardous waste materials simply, and inappropriately, turns the statute on its head.

Further, we are persuaded by the reasoning of the magistrate on this issue. As noted by the magistrate, section 26 of the Penal Code states that: "*All* persons are capable of committing crimes except those belonging to the following classes: [¶] . . . [¶] Five—Persons who committed the act or made the omission charged through misfortune or by accident, when it appears that there was no evil design, intention, or culpable negligence." (Italics added.) We note that section 26 of the Penal Code applies whether the crime in question is one of commission *or* one of omission—making it applicable in this case even if we were to accept defendant's characterization of section 25189.5(a) as a statute which defines a crime of omission. In addition, we note that it is reasonably arguable from the evidence adduced at the preliminary hearing (and that is all we are concerned with at this stage of the proceedings) that defendant was culpably negligent in allowing increasing amounts of hazardous waste liquids to be stored on the company's premises when it was apparent (or should have been apparent) to him that he might very well not be able to afford to have those wastes properly removed from the premises and discarded. Thus, even if we were to assume arguendo that the charged offense was a crime of omission and that the defense of "financial impossibility" was generally available in such cases as a matter of law, such a defense was not supported by the evidence adduced at the preliminary hearing.

The above serves to defeat any argument that a "financial impossibility" argument should have prevailed during the trial court's hearing on defendant's Penal Code section 995 motion.

## III.

### Remaining Contentions

The above discussion has resolved the primary issues raised on appeal in this case. Defendant has additionally asserted, both in the trial court and here, three secondary arguments in support of the trial court's ruling on his Penal Code section 995 motion. We will briefly address each of the arguments and conclude that none of them has merit:

■ First, defendant asserts that he cannot be convicted of improperly disposing of hazardous wastes under section 25189.5 because subdivision (b) of that section requires that any such disposal be done "knowingly"—and the record is clear that he did not know that his action of abandonment constituted an unlawful "disposal." Defendant misapprehends the meaning of "knowingly." Simply put, " 'Penal Code section 7, subdivision 5 defines "knowingly" as importing only knowledge that the facts exist which bring the act or omission within the provisions of the code. It does not require any knowledge of the unlawfulness of such act or omission. While [section 25189.5 is not contained in the Penal Code], the Penal Code definition is nonetheless persuasive in determining the intent of the Legislature in using that word in other [penal] statutes. California case law has long held that the requirement of "knowingly" is satisfied where the person involved has knowledge of the facts, though not of the law. [Citations.]' " (*People* v. *Gregory* (1990) 217 Cal.App.3d 665, 677 [266 Cal.Rptr. 527], quoting from *Brown* v. *State Department of Health* (1978) 86 Cal.App.3d 548, 554 [150 Cal.Rptr. 344].) Here, there is no question but that defendant was aware of the actual facts surrounding his vacating of the manufacturing premises and his permanently leaving behind hazardous waste materials.

■ Second, defendant cites *Cox* v. *Louisiana* (1965) 379 U.S. 559 [13 L.Ed.2d 487, 85 S.Ct. 476] and asserts that he cannot be convicted of having unlawfully disposed of hazardous waste materials because it is unconstitutional for the government to prosecute someone for conduct which the government previously "approved." Defendant argues that the county's involvement in (a) overseeing the environmental "sanitizing" of the manufacturing premises once he had vacated it, (b) approving the "auctioning off" of the various materials and pieces of equipment left behind at the manufacturing premises and (c) holding the landlord/owner of the manufacturing premises liable for the cost of bringing the manufacturing premises into compliance with extant governmental standards of environmental "cleanliness" constituted an implicit governmental acquiescence in and to defendant's *never* being held liable for his alleged violation of section

25189.5(a). This argument is utterly specious: (a) *Cox* v. *Louisiana* is a civil rights case in which the governmental action in question had constituted "an indefensible sort of entrapment" (379 U.S. at p. 571 [13 L.Ed.2d at p. 496], quoting from *Raley* v. *Ohio* (1959) 360 U.S. 423, 426 [3 L.Ed.2d 1344, 79 S.Ct. 1257])—while there is nothing in this case to suggest that any governmental official, by word or deed or otherwise, ever suggested to defendant that he could abandon hazardous wastes with impunity; and (b) the fact that a landowner might be held responsible for bringing the condition of his land into compliance with governmental environmental regulations and standards does not imply, by logic or necessity or otherwise, that a person who was substantially responsible for abandoning hazardous wastes on the land in the first instance is thereby absolved of all responsibility for his or her acts.

■ Finally, defendant asserts that an application of section 25189.5(a), as we have interpreted it, to the facts of this case would violate his constitutional right to the due process of law. In particular, defendant argues that section 25189.5(a), as we have interpreted it, fails to give "fair warning" of the conduct which it prohibits. This court had occasion to visit this same general issue in *People* v. *Gibbons* (1989) 215 Cal.App.3d 1204 [263 Cal.Rptr. 905]:

■ "The due process clause of the Fourteenth Amendment of the United States Constitution includes the concept that statutes must be written with sufficient definiteness and certainty so as to provide fair notice or fair warning of what conduct is either required or proscribed by the statute. [Citation.] Similarly, '[t]here can be no doubt that a deprivation of the right of fair warning can result not only from vague statutory language but also from an unforeseeable and retroactive judicial expansion of narrow and precise statutory language.' [Citation.]

"The concept of fair notice is not intended ' "to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." [Citation.]' [Citation.] In the case of judicial construction, due process is not violated merely because the language of the statute is being applied to a particular situation for the first time. . . . Nor do due process concerns of fair warning arise where the language of the statute is not being expanded in an unforeseeable manner even though the case is one of first impression and even if dicta in prior decisions suggested a narrower application. . . .

" ' "This is not a case where an act clearly not criminal at the time of its occurrence, is so declared to be at some subsequent time. Nor is it a case where criminal responsibility should not attach because the actor could not reasonably understand that his contemplated conduct was proscribed." . . . "It is not always true that where the definition of a crime is extended by judicial construction, a conviction which results therefrom is a denial of due process." . . . "[T]he law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or a short imprisonment, as here; he may incur the penalty of death. . . . *'The criterion in such cases is to examine whether common social duty would, under the circumstances, have suggested a more circumspect conduct.'* " ' (*People* v. *Sobiek* [(1973)] 30 Cal.App.3d [458] at pp. 474-475 [106 Cal.Rptr. 519, 82 A.L.R.3d 804].)" (215 Cal.App.3d at pp. 1210-1211.)

 Here—in light of the fact that section 25113 explicitly defines "disposal" as including "abandonment"—"common social duty would, under the circumstances, have suggested a more circumspect conduct" on the part of defendant than leaving behind almost 200 drums of unlabelled hazardous liquid wastes without providing for their lawful disposal. Section 25189.5(a) as interpreted herein and as applied to defendant in this case, does not violate defendant's constitutional right to the due process of law.

## DISPOSITION

The trial court erred in granting defendant's Penal Code section 995 motion to set aside the information. This matter is reversed and remanded to the trial court with directions that it:

(1) Vacate its ruling granting defendant's Penal Code section 995 motion and setting aside the People's information;

(2) Reinstate the People's information;

(3) Return defendant's Penal Code section 995 motion to the trial court's calendar for rehearing in light of this opinion (and, in particular, in light of the manner in which we have herein defined § 25189.5(a));[8] and

---

[8]We have reversed the trial court in this case to correct an error of statutory interpretation—a pure question of law. In no sense have we determined the matter before us on the basis of having independently determined any of the factual issues presented to the trial court in connection with defendant's Penal Code section 995 motion.

(4) Conduct such further proceedings consistent with this opinion as may be appropriate.

Ramirez, P. J., and Hollenhorst, J., concurred.

A petition for a rehearing was denied July 17, 1992, and respondent's petition for review by the Supreme Court was denied September 23, 1992.