[No. A069598. First Dist., Div. Two. July 25, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM J. BOOTH, Defendant and Appellant.

## COUNSEL

Maribeth Halloran, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, and Shannon Garcia Chase, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**HITCHENS, J.\***—William J. Booth was convicted by a jury of one count of presenting a false and fraudulent insurance claim (former Ins. Code, § 1871.1, subd. (a)(1)) and one count of preparing a writing in support of a fraudulent insurance claim. (*Id.,* § 1871.1, subd. (a)(5)). He was given a two-year suspended sentence, ordered to pay a restitution fine and placed on supervised probation.

On appeal Booth claims error in the refusal of two defense-proffered modifications to standard jury instructions defining the elements of the crimes charged. We affirm.

---

*Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

## I. BACKGROUND

On May 22, 1992 Booth was involved in a rear-end collision in which his 1991 Mercedes was struck from behind by another vehicle. Booth was driving and his girlfriend, Wendy Govan, was in the passenger seat. Neither Booth nor Govan asked for an ambulance or complained of being injured at the time, nor did either receive medical treatment for injuries resulting from the accident.

Booth filed a claim for personal injuries with his own insurance company, Liberty Mutual, which was eventually settled for $1,000.[1] The driver responsible for the accident was insured with Farmers Insurance Group (Farmers) which paid for the property damage sustained by Booth. By way of letter dated June 25, 1992 (all further unspecified calendar references are to that year), Farmers's claims agent Dana Kruger inquired about the accident. In July, while Kruger met with Govan to settle her personal injury claim, Govan mentioned that Booth might have been injured as well. Kruger then contacted Booth, who confirmed that he was injured, and set up a meeting to discuss his personal injury claim. Booth was not home at the time Kruger arrived for the scheduled visit, so she left two forms at his doorstep—an authorization to obtain medical information and a medical history form. The medical history was returned to Farmers on September 2.

On October 2, Kruger spoke to Booth on the telephone. He said his treatment was complete, that he missed two and a half weeks from work and that Farmers had all the medical bills. Kruger told Booth the wage loss needed to be verified by his employer; Booth told her to send the form to Govan.

The wage loss verification was sent to Govan on October 12 and returned to Kruger on October 23. It was purportedly signed by Charlie Plummer, the Sheriff of Alameda County, which was Booth's employer. Kruger became suspicious about the authenticity of the verification, since she thought it very unlikely Plummer would personally sign such a form. Consequently, she contacted the sheriff's office and learned that the signature on the form was a forgery.

Kruger then contacted the Danville Immediate Care Center, from whom she had received Booth's medical bills, including notes signed by a Dr. Bennett excusing him from work. As a result of those conversations, she discovered that all of the medical paperwork submitted on behalf of Booth

---

[1]At trial, Booth faced two additional charges of insurance fraud in connection with the Liberty Mutual claim. He was acquitted on both counts.

was bogus. It was stipulated at trial that Dr. Bennett never saw or treated Booth at any time before, during or after the accident.

On November 16 and 19 Kruger had phone conversations with Booth which were recorded with his permission. Booth again confirmed that he had been injured in the accident, and that he had been treated by a doctor whose "name starts with a B, I'm not sure." He told Kruger that the bills she had received from the Danville Immediate Care Center were for his medical treatment, and, in response to her inquiry, confirmed that he had been treated by Dr. Bennett. In response to her inquiries, Booth also confirmed that he had missed between two and two and a half weeks from work, and that the doctor bills and wage loss verification forms submitted to Kruger were done with his permission. However, he indicated that he did not remember actually sending any of the forms to Kruger, suggesting that Govan must have prepared the forms for him to sign and then sent them out herself.

### Defense

Booth testified that Govan had initiated and engineered the fraudulent claim without his knowledge, and when he found out about it, he played along to protect her. He also believed he was entitled to recover money from Farmers for a "nuisance" claim, without submitting documentation, and understood this as the claim he was pursuing. Govan testified and admitted she had (1) faked the medical records and submitted them to Farmers on Booth's behalf; (2) forged Booth's signature on the medical authorization; and (3) forged the sheriff's signature on the wage loss verification. Govan claimed she intended to intercept the settlement checks before they got to Booth and use them for herself. In May 1994, Govan pleaded guilty to insurance fraud and forgery.

### II. DISCUSSION

#### A. *Modification of CALJIC Nos. 15.40 and 15.41*

Booth was convicted of violating former Insurance Code section 1871.1, subdivision (a)(1), which made it unlawful to "*Knowingly* present or cause to be presented any false or fraudulent claim for the payment of a loss . . . under a contract of insurance" and former Insurance Code section 1871.1, subdivision (a)(5), which made it a crime to "*Knowingly* prepare, make, or

subscribe any writing, with the intent to present or use it, or allow it to be presented in support of any false or fraudulent claim." (Italics added.)[2]

The jury was instructed on the elements of these sections in accord with CALJIC Nos. 15.40 and 15.41. CALJIC No. 15.40 provides:

"Defendant is accused in Counts one and three of the information of having violated Section 1871.1(a)(1) of the Insurance Code, a crime.

"Every person who, with the specific intent to defraud presents or causes to be presented any false or fraudulent claim for the payment of a loss, including payment for a loss under a contract of insurance is guilty of a violation of Section 1871.1(a)(1) of the Insurance Code, a crime.

"In order to prove such crime, each of the following elements must be proved:

"1. That a person presented or caused to be presented a false or fraudulent claim for payment of a loss, including payment of a loss under a contract of insurance, and

"2. Such person acted with specific intent to defraud."

With respect to the charge of fraudulently supporting an insurance claim (§ 1871.1, subd. (a)(5)), the jury was given CALJIC No. 15.41, whose elements are described for the jury as follows: "1. A person [prepared] [made] [signed] a writing with the specific intent to present, use or allow to be presented or used in support of a false or fraudulent claim for payment of a loss covered by insurance, and [¶] 2. Such person acted with the specific intent to defraud."

In chambers, Booth requested the trial court modify each of these instructions to insert the word "knowingly." With the modifications, the jury would be instructed that a finding of guilt would require the defendant "knowingly" presented a false or fraudulent claim and "knowingly" prepared or signed a writing with the specific intent to present it in support of a false claim. The court refused to modify the standard instructions.

 On appeal, Booth claims that by refusing his request to insert the word "knowingly" into CALJIC Nos. 15.40 and 15.41, the trial court failed

---

[2]In 1992, Insurance Code section 1871.1 was repealed and reenacted without change as Penal Code section 550. (Stats. 1992, ch. 675, § 8, No. 5 Deering's Adv. Legis. Service, p. 2464.) For convenience, all further unspecified statutory references are to the former section of the Insurance Code.

to instruct on an essential element of the offense. Booth further argues that the error deprived him of his due process right to have every element of the crime determined by the jury and is therefore reversible per se. (See *Sullivan v. Louisiana* (1993) 508 U.S. 275, 278-281 [124 L.Ed.2d 182, 188-190, 113 S.Ct. 2078, 2081-2082].)

We reject Booth's contention that the CALJIC instructions are constitutionally deficient due to omission of the word "knowingly." Both of the subject instructions require the jury to make the dual finding that (1) the defendant present or prepare or sign a writing in support of a false claim *and* (2) do so with *specific intent* to defraud. The element of "knowledge," which Booth claims is missing from the instruction, is inherent in the concept of specific intent to defraud.

The word "knowingly" merely implies the person know of facts which bring the act or omission within the scope of the statute. (Pen. Code, § 7, subd. 5.) Thus, " ' "California case law has long held that the requirement of 'knowingly' is satisfied where the person involved has knowledge of the facts, though not of the law. [Citations.]" ' " (*People* v. *Taylor* (1992) 7 Cal.App.4th 677, 692 [9 Cal.Rptr.2d 227].)

" 'Intent to defraud is an intent to commit a fraud.' [Citation.] " 'Fraud' " and "dishonesty" are closely synonymous. Fraud is defined as "a dishonest stratagem." (Webster's Third New Internat. Dict. (1961) p. 904.) It "may consist in the misrepresentation or the concealment of material facts" [citation], or a statement of fact made with "conscious[ness] of [its] falsity." [Citation.]' [Citation.] *Defendant could not have submitted a claim with the intent to defraud unless he was conscious of its falsity . . . ."* (*People* v. *Gregory* (1990) 217 Cal.App.3d 665, 676-677 [266 Cal.Rptr. 527], italics added.)

Thus, the element of "specific intent to defraud," a required finding under the CALJIC instructions, is more rigorous than the concept of "knowingly" and includes the latter. As the jury was told through CALJIC No. 15.26, "[a]n intent to defraud is an intent to *deceive another person* or to induce that person to part with property or to alter that person's position to [its] injury or risk, and to accomplish that purpose by some false statement, false representation of fact, wrongful concealment or suppression of truth, or by any other artifice or act *designed to deceive*." (Italics added.) Since specific intent to defraud requires both knowledge of the true facts and an intent to deceive, it was impossible for Booth to have intended to defraud Farmers by presenting a false claim, and to have done so *unknowingly*.

Citing his testimony that he believed he was entitled to submit a "nuisance" claim for his pain and suffering to Farmers without proper documentation, Booth suggests the CALJIC instructions allowed the jury to convict

him of violating the statute even if they believed he filed the claim without "knowing" it to be false. We disagree.

 While it is undoubtedly true that one can "knowingly" present a false claim without specific intent to defraud, for example by presenting false data to support a claim in the good faith belief that the information is correct (see *People* v. *Burnham* (1961) 194 Cal.App.2d 836, 842 [15 Cal.Rptr. 596]), the opposite is not true. One simply cannot *intend to defraud* another by submitting false information "unknowingly." (Cf. *People* v. *Scofield* (1971) 17 Cal.App.3d 1018, 1026 [95 Cal.Rptr. 405] ["One who wilfully submits a claim, knowing it to be false, necessarily does so with intent to defraud"]; *Cummings* v. *Fire Ins. Exchange* (1988) 202 Cal.App.3d 1407, 1418 [249 Cal.Rptr. 568] [". . . [T]he intent to defraud the insurer is necessarily implied when the misrepresentation is material and the insured wilfully makes it with the knowledge of its falsity."].)[3]

We conclude the trial court had no duty to modify CALJIC Nos. 15.40 and 15.41 by inserting the word "knowingly."

### B. *Modification of Aiding and Abetting Instruction*

 The trial court gave CALJIC No. 3.01, which defines the concept of aiding and abetting, refusing Booth's request to augment the instruction by adding the phrase italicized and bracketed below: "A person aids and abets the commission or attempted commission of a crime when he or she, [¶] (1) with knowledge of the unlawful purpose of the perpetrator and [¶] (2) with the intent or purpose of committing, encouraging, or facilitating the commission of the crime, by act or advice aids, promotes, encourages or instigates [, *and actually aids or assists, the commission of the crime*]."

Booth contends the court's refusal to accept his modification to the instruction was prejudicial error, because it permitted the jury to find accomplice liability if he simply "encouraged" or "advised" Govan to commit insurance fraud without having actually "assisted" in its commission.

The underlying premise of Booth's argument is that to be found guilty of "aiding and abetting" an accused must satisfy two separate tests—"abetting"

---

[3]Booth argues that it was possible he could have "unknowingly" presented or supported a false claim if he supplied false information to Farmers "to protect his girlfriend and to settle his pain and suffering claim." Booth confuses the *motive* for committing fraud with the fraud itself. By presenting information he knew to be false with the intent that Farmers rely upon it to settle his claim, Booth acted with specific intent to defraud. This is all the "knowledge" the statute requires. (Pen. Code, § 7, subd. 5.)

which requires advice and encouragement with specific intent to facilitate the crime, and "aiding" which requires that one physically assist in the commission of the crime.

This argument was squarely addressed and rejected in a thoughtful opinion by Justice Wunderlich in *People* v. *Campbell* (1994) 25 Cal.App.4th 402 [30 Cal.Rptr.2d 525] (*Campbell*), who states, in pertinent part: "[D]espite the simple logic of Smith's claim, he cites, and our research has revealed, no case holding, or even suggesting, that 'aid and abet' requires separate findings concerning two distinct types of *acts* (assisting and encouraging) before a jury may properly convict a defendant as an aider and abettor. On the contrary, according to our Supreme Court, ' "[t]o be an abettor the accused must have *instigated or advised* the commission of the crime *or been present for the purpose of assisting in its commission.*" ' (*People* v. *Durham* [1969] 70 Cal.2d [171,] 181 [74 Cal.Rptr. 262, 449 P.2d 198], quoting *People* v. *Villa* (1957) 156 Cal.App.2d 128, 133 [318 P.2d 828], italics in *Durham*; accord, *People* v. *Francis* (1969) 71 Cal.2d 66, 72 [75 Cal.Rptr. 199, 450 P.2d 591].) ' "[T]he test is whether the accused in any way, directly or indirectly, aided the perpetrator by acts *or* encouraged him by words or gestures." ' [Citations.]" (*Campbell, supra,* 25 Cal.App.4th at p. 411, original italics.)

Like the defendant in *Campbell*, Booth relies heavily on *People* v. *Elliott* (1993) 14 Cal.App.4th 1633 [18 Cal.Rptr.2d 426] where the court observed that a defendant who only encouraged felons to run away and hide after the commission of the crime but had not actually harbored, concealed, or aided them did not fit within the definition of an *accessory after the fact* as set forth in Penal Code section 32. (14 Cal.App.4th at pp. 1641-1642.) However, such reliance is misplaced. *Campbell* clearly points out that, while *Elliott* drew from case law discussing aiding and abetting, it "did not purport to construe section 31 or the phrase 'aid and abet.' Moreover, although *Elliott* and the cases cited therein recognize a distinction between the terms 'aid' and 'abet,' they do not suggest that the phrase 'aid and abet' in section 32 [*sic*] requires separate findings that one assisted and encouraged the perpetrator of a crime." (25 Cal.App.4th at p. 412.)

*Campbell* explains that the reason our courts have been careful to draw the distinction between "aiding" and "abetting" is not because there is a two-pronged test, but to emphasize that one cannot be convicted of being an accomplice by conduct alone, but must also share the principal's purpose or goal to commit the crime, i.e., there must be a union between act and intent. For that reason, the term "abet," which requires a guilty state of mind, has been recognized as an indispensable element of accomplice liability. (*Campbell, supra,* 25 Cal.App.4th at p. 414.)

While accomplice liability cannot be predicated on conduct absent the required mental state, one *can* be guilty as an accomplice (if he shares the goal of the perpetrator) without having actually assisted the commission of the offense, e.g., by "instigating," or "advising" the perpetrator to commit it or by having been "present for the purpose of its commission." (See *Campbell, supra*, 25 Cal.App.4th at p. 411, and cases cited.)

Like the court in *Campbell*, we note that the instruction attacked here as insufficient was modeled after the one proposed by the California Supreme Court in *People* v. *Beeman* (1984) 35 Cal.3d 547, 561 [199 Cal.Rptr. 60, 674 P.2d 1318]. Review in *Campbell* was denied on August 17, 1994. (25 Cal.App.4th at p. 414.)

We adopt the reasoning of *Campbell* to conclude that CALJIC No. 3.01 adequately instructs the jury on the concept of aiding and abetting. Booth's improvisation on the instruction was properly refused.

### III. Disposition

The judgment is affirmed.

Kline, P. J., and Haerle, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 23, 1996.