Filed 10/9/25  P. v. Bonavilla CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E081765 |
| v. | (Super.Ct.No. RIF1880191) |
| DENNIS DAVIN BONAVILLA, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Jeffrey M. Zimel, Judge.  Affirmed.

Brown & Stedman, Edwin B. Brown and Michael C.P. Clark, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant Dennis Davin Bonavilla was charged by second amended indictment for his part in an insurance fraud scheme and he appeals from his convictions for one count of conspiracy to commit insurance fraud (Pen. Code,[1] §§ 182, subd. (a)(1), 550, subd. (a)(6), count 3), three counts of insurance fraud (§ 550, subd. (a)(6), counts 4-6), one count of solicitation with the intent to commit insurance fraud (§ 549, count 7), and nine counts of money laundering (§ 186.10, subd. (a), counts 9-17). Defendant argues his convictions are not supported by substantial evidence. Applying the very deferential standard of review to such a claim, we affirm.

## I.

## FACTS AND PROCEDURAL BACKGROUND

Codefendants Brian LaPorte and Jeffrey Ogletree established Free Choice Healthcare and offered their services to hospitals as a means of avoiding losses related to care provided to indigent patients who did not qualify for government assisted insurance such as Medicaid and Medicare. The idea behind Free Choice was that it would purchase insurance plans for indigent patients in exchange for a "donation" of 35 percent of the claims paid out from insurers for medical services. Although Free Choice said it would pay for premiums to cover insurance for an entire year, the policies lapsed after one month. Codefendants represented that defendant was an executive of Free Choice.[2]

---

[1] Undesignated statutory references are to the Penal Code.

[2] In their briefs, the parties provide extensive background about codefendants' and defendant's activities in offering Free Choice's services to hospitals and healthcare services in Wisconsin and Illinois. We need not repeat it here.

2

While working as a director for Free Choice, defendant approached his friend Dr. Babar Iqbal,[3] a Riverside pain management doctor, about participating in the scheme. Defendant told Dr. Iqbal that Free Choice would pay for insurance plans for qualifying, indigent patients. Dr. Iqbal signed an agreement with Free Choice, providing that for each patient he convinced to switch from their current medical insurance to a plan obtained by Free Choice, he would pay Free Choice up to 35 percent of the claims he collected from those insurance companies. Defendant referred to this payment as his commission.

Dr. Iqbal discussed Free Choice with several of his patients, most of whom were enrolled in government-assisted insurance such as Medi-Cal or Medicaid. Because those plans only paid for certain treatments, Dr. Iqbal told those patients that by enrolling in Free Choice they would receive better treatments.

Dr. Iqbal gave the patients applications to complete, which included forms that purported to make the patients employees of fictitious companies. Most of the patients were also given a power of attorney to complete.

Nobody explained to the patients that they were agreeing to become employees of either Kingmakers or Drexel Group or explained what a power of attorney is. Nor was it explained to those patients that their current insurance or disability benefits could be affected. Some of Dr. Iqbal's patients did not speak English or had difficulty reading.

---

[3] Codefendant Dr. Iqbal pleaded guilty to conspiracy to commit embezzlement, identity theft, and insurance fraud and testified at defendant's trial.

3

Most of them did not read what they were signing, but said they trusted Dr. Iqbal and did what he asked of them.

Dr. Iqbal provided his patients' applications and personal information to defendant so he, defendant, could enroll the patients in insurance plans obtained by Free Choice. The insurance policies obtained by Free Choice for the patients were supposed to last a year and include copays and deductibles. However, Dr. Iqbal agreed, illegally, to waive all copays and deductibles for patients enrolled in those new policies. Neither defendant nor Dr. Iqbal explained to the patients that they were responsible for paying anything under the new policies, saying they would receive free healthcare.

Although the applications purported to make Dr. Iqbal's patients employees of Free Choice, Drexel Group, or Kingmakers, the patients were never employed by or performed any work for those companies. After being enrolled in new insurance policies, the patients were treated by Dr. Iqbal at his surgery center, but their treatments did not change or make the patients feel any better than before.

Defendant and LaPorte used companies like ADP and Oasis Outsourcing to process payroll checks to make it appear that Dr. Iqbal's patients were working full time for Drexel or Kingmakers.

The payroll checks issued by ADP or Oasis were never received by the patients. Instead, most of the checks were endorsed by LaPorte as "attorney in fact" for the patients and deposited into Free Choice's or Drexel Group's bank accounts.

4

Under the insurance plans obtained by Free Choice, Dr. Iqbal was able provide more expensive procedures to his patients that had not been covered by their current insurance plans. Dr. Iqbal admitted that money was his and defendant's primary motivation in steering the patients to Free Choice. And, pursuant to his agreement with Free Choice and defendant, Dr. Iqbal gave defendant several checks written out to Drexel Group, Kingmakers, or Free Choice that represented their 35 percent share of money Dr. Iqbal received after billing the insurance companies.

When Free Choice stopped paying premiums on the policies obtained for Dr. Iqbal's patients, and the patients complained to Dr. Iqbal about receiving bills from the insurers, they were referred to defendant and told not to worry about it.

A representative from Health Net, one of the insurers, testified they would almost certainly have not issued the policies had they known (1) the patients were not employees of Drexel or Kingmakers, (2) Dr. Iqbal had illegally waived copays and deductibles on the policies, and that (3) Dr. Iqbal was paying Free Choice a percentage of the money paid on the patients' claims. Similarly, a representative from United Healthcare testified it would not have issued policies to Dr Iqbal's patients if it knew the patients were not employees.

An investigator with the district attorney's office testified about several checks from Dr. Iqbal to Drexel Group or Free Choice, ranging in the amount of $30,000 to over $76,000, that were then deposited in a Chase bank account. The investigator opined

5

those checks represented the 30 to 35 percent kickback that Dr. Iqbal agreed to pay Free Choice.[4]

Defendant introduced testimony of two witnesses who testified they believed defendant had a reputation for honesty and integrity.

A jury found defendant guilty of one count of conspiracy to commit insurance fraud (§§ 182, subd. (a)(1), 550, subd. (a)(6), count 3), three counts of insurance fraud (§ 550, subd. (a)(6), counts 4-6), one count of solicitation with the intent to commit insurance fraud (§ 549, count 7), and nine counts of money laundering (§ 186.10, subd. (a), counts 9-17). The jury also rendered true findings on sentencing allegations, including an aggravated white collar crime finding. (§§ 186.10, subd. (c)(1)(b), 186.11, subd. (a)(2), 1203.045, subd. (a).)

The trial court dismissed the sentencing allegations pursuant to section 1385 and sentenced defendant under section 1170, subdivision (h), to a split sentence of two years with six months in county jail and 18 months on mandatory supervision. Defendant timely appealed.

II.

DISCUSSION

Defendant contends the record does not contain substantial evidence to support his convictions for insurance fraud (counts 4-6) and for solicitation to file a fraudulent

---

[4] In their brief, the People recount in considerable detail defendant's interview with investigators following his arrest, which was introduced into evidence. Because we conclude, *post*, that other evidence in the record amply supports defendant's convictions, we need not discuss defendant's statements during his interview.

insurance claim (count 7). In addition, defendant claims in a very cursory fashion—without cogent argument or citation to legal authority and the record—that his convictions for conspiracy to commit insurance fraud (count 3) and money laundering (counts 9-17) must also be reversed for lack of sufficient evidence. We are not required to develop arguments for defendant and may treat his bald claims of error regarding counts 3 and 9 through 17 as having been waived. (*People v. Williams* (1997) 16 Cal.4th 153, 206 ["Points 'perfunctorily asserted without argument in support' are not properly raised."]; *People v. Stanley* (1995) 10 Cal.4th 764, 793 ["'[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration.'"].) In any event, for the reasons stated *post* we conclude substantial evidence supports each of defendant's convictions.

    A. *Standard of Review*.

"'""In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'"" (*People v. Oyler* (2025) 17 Cal.5th 756, 819-820; see *People v. Johnson* (1980) 26 Cal.3d 557, 578.)

7

"'The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (*People v. Westerfield* (2019) 6 Cal.5th 632, 713; see *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320.) "'Even where, as here, the evidence of guilt is largely circumstantial, our task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might ""'be reasonably reconciled with the defendant's innocence.'""" (*People v. Veamatahau* (2020) 9 Cal.5th 16, 36.)

"Reversal is not warranted 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction.]"'" (*People v. Thomas* (2023) 14 Cal.5th 327, 378.) "Given this deferential standard of review, a 'defendant bears an enormous burden in claiming there is insufficient evidence' to support a conviction."[5] (*People v. Wear* (2020) 44 Cal.App.5th 1007, 1020; accord, *People v. Torres* (2024) 107 Cal.App.5th 513, 532 ["'Defendant bears an "enormous burden."'"].)

_____

[5] In his opening brief, defendant sets forth the appropriate standard of review for challenges to the sufficiency of the evidence to support his convictions, but also contends his appeal presents questions of statutory interpretation that are reviewed on appeal independently. (See *People v. Walker* (2024) 16 Cal.5th 1024, 1032 [interpretation of statute is a question of law reviewed de novo].) Because neither of defendant's claims of error are dependent on interpretation of the relevant statutes, we apply the substantial evidence standard of review.

B.  *Aiding And Abetting Insurance Fraud.*

Defendant contends the record does not support his convictions on counts 4 through 6 for aiding and abetting insurance fraud.  We find otherwise.

It is unlawful "to aid, abet, solicit, or conspire with any person" to "[k]nowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit."  (§ 550, subd. (a)(6).)  The elements of the crime of insurance fraud are "(1) the knowing presentation of a false claim for payment of a health care benefit, (2) with the intent to defraud the recipient.  [Citation.]  Insurance fraud is a specific intent crime; the defendant must specifically intend to defraud a person with a false or fraudulent claim.  [Citation.]  The crime is complete upon the presentation of the claim, regardless of whether anyone is defrauded by or anything of value is taken or received in consideration for the claim."  (*Banerjee v. Superior Court* (2021) 69 Cal.App.5th 1093, 1103; see *id*. at p. 1119.)

An insurance claim is fraudulent "'when it is "characterized in any way by deceit"' [citation] or 'result[s] from deceit or conduct that is done with an intention to gain unfair or dishonest advantage.'"  (*People ex rel. Allstate Ins. Co. v. Discovery Radiology Physicians, P.C.* (2023) 94 Cal.App.5th 521, 543 (*Discovery Radiology*); see *State ex rel. Wilson v. Superior Court* (2014) 227 Cal.App.4th 579, 600 ["California law uses the words 'fraud' and 'deceit' interchangeably."]; *People v. Gregory* (1990) 217 Cal.App.3d 665, 676 ["'"Fraud" and "dishonesty" are closely synonymous.'"].)

9

"'[A] person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts.' [Citation.] '"A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime."'" (*People v. Hin* (2025) 17 Cal.5th 401, 455.) '"Whether defendant aided and abetted the crime is a question of fact, and on appeal all conflicts in the evidence and reasonable inferences must be resolved in favor of the judgment.'" (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1147-1148.)

The record contains substantial evidence that defendant aided and abetted Dr. Iqbal in presenting fraudulent claims for health benefits to three insurance companies—Health Net, United Healthcare, and Aetna—with the specific intent to defraud the insurers. Free Choice used itself or fake and sham companies—Drexel Group or Kingmakers—to obtain group policies from those insurers for Dr. Iqbal's patients by falsely representing the patients were employees who were eligible for insurance coverage. Two of Dr. Iqbal's patients testified they were told the way the insurance worked was that it looked as if they were employees, but any compensation or paycheck, which they never received, went toward their medical procedures or paying the premium on the insurance. None of the patients Free Choice signed up for insurance coverage were employed by Free Choice or the sham companies, none of them performed

10

any work on behalf of Free Choice or the sham companies, and most of them had never heard of those companies.

Defendant and Dr. Iqbal targeted unsophisticated patients, some of whom had difficulty reading English. Patients were given a packet of documents and urged to complete the forms quickly and to sign where indicated. The patients testified they trusted Dr. Iqbal and signed the forms without reading them or asking what they were agreeing to. Defendant then submitted the applications, on behalf of Free Choice, and obtained group health insurance policies for those patients based on false representations the patients were eligible employees. The goal of the scheme to enroll patients in group insurance plans was for Dr. Iqbal to bill for more services and earn more for himself and defendant. Dr. Iqbal agreed to pay defendant and Free Choice 30 to 35 percent of the fees he eventually collected from the insurers for those services.

Defendant used the payroll services ADP and Oasis to further the scheme and issue paychecks based on the misrepresentations that Dr. Iqbal's patients were actual employees who were eligible for coverage. However, the paychecks issued by the payroll services were never received by the patients. Instead, those checks were endorsed and deposited by LaPorte into the sham companies' bank accounts.

Defendant argues the People introduced no evidence he "had any specific intent or purpose to commit fraud." Assuming defendant means the People introduced no *direct* evidence of specific intent, none was necessary. "Mental state and intent are rarely susceptible of direct proof and must therefore be proven circumstantially." (*People v.*

11

*Thomas* (2011) 52 Cal.4th 336, 355.) "Specific intent to defraud is often proven by circumstantial evidence; it is thus typically inferred from all of the facts and circumstances. [Citations.] Furthermore, '[p]roof of a false factual representation need not be by words alone; it may be implied from conduct; it may be made either expressly or by implication; the form of the words in which the pretense is couched is immaterial; if the words or conduct are intended to create the impression that defendant is making a representation as to a present fact, the pretense is within the statute.'" (*People v. Bollaert* (2016) 248 Cal.App.4th 699, 715-716.)

Defendant "necessarily acted with specific intent to defraud when he presented information he knew to be false"—that Dr. Iqbal's patients were employees of Free Choice or the sham companies, and were eligible for group insurance—"with the intent that the insurance compan[ies] rely upon it" and pay claims submitted for procedures performed on those patients by Dr. Iqbal. (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 279 (*Dieguez*), citing *People v. Booth* (1996) 48 Cal.App.4th 1247, 1254, fn. 3 ["By presenting information he knew to be false with the intent that [the insurer] rely upon it to settle his claim, [the defendant] acted with specific intent to defraud."]; see *People v. Scofield* (1971) 17 Cal.App.3d 1018, 1026. ["One who wilfully submits a claim, knowing it to be false, necessarily does so with intent to defraud."].)

C. *Solicitation*.

Next, defendant contends the record does not support his conviction on count 7 for soliciting another person to file a fraudulent insurance claim. Again, we find otherwise.

12

"Penal Code section 549 makes it a crime to knowingly, or with reckless disregard for the truth, solicit, accept, or refer a client who intends to file a fraudulent claim for insurance benefits." (*People ex rel. Alzayat v. Hebb* (2017) 18 Cal.App.5th 801, 813 (*Hebb*).) Like specific intent, the element that defendant knew the claims would be fraudulent can be proven with circumstantial evidence. (See, e.g., *People v. Lewis* (2001) 26 Cal.4th 334, 379 ["'Reliance on circumstantial evidence is often inevitable when, as here, the issue is a state of mind such as knowledge.'"].) As stated *ante* a claim is fraudulent and in violation of section 550 if it is submitted deceitfully. (*Discovery Radiology*, *supra*, 94 Cal.App.5th at p. 543; *Dieguez*, *supra*, 89 Cal.App.4th at p. 279.)

The People's theory was that defendant was a "capper"[6] who convinced Dr. Iqbal to encourage his patients to switch from their current insurance companies to fraudulently obtained policies, then give Free Choice and defendant a kickback of 30 to 35 percent of the claims Dr. Iqbal received from the new insurance carriers for more expensive medical procedures. Defendant and Dr. Iqbal focused their scheme on patients who were already enrolled in government-assisted health insurance plans such as Medi-Cal or Medicaid. They targeted vulnerable patients who were suffering considerable pain and who hoped Dr. Iqbal's treatment would provide relief. And, as indicated, *ante*, defendant and Dr.

---

[6] A "capper" is "[a] decoy or lure for the purpose of swindling." (*Barron v. Board of Dental Examiners* (1930) 109 Cal.App. 382, 385; see Webster's 3d New Internat. Dict. (1993) p. 333, col. 1 [inter alia, defining "capper" as "a lure, decoy, or steerer esp. in some illicit or questionable activity"].) The Insurance Frauds Prevention Act (Ins. Code, § 1871 et seq.) expressly criminalizes the use of cappers "to procure clients or patients to perform or obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured individual or their insurer." (Ins. Code, § 1871.7, subd. (a); see *Hebb*, *supra*, 18 Cal.App.5th at p. 813.)

13

Iqbal focused on unsophisticated patients, some of whom did not speak English as their first language.

As the People contend, the record contains substantial evidence that defendant solicited Dr. Iqbal to encourage certain of his patients to sign up for fraudulently obtained insurance plans so Dr. Iqbal could bill the carriers for more expensive medical procedures performed at his surgery center. Several of Dr. Iqbal's patients testified there was no actual change in their treatments after switching insurance carriers, just that the procedures were now performed in a different location. This evidence satisfies the element that defendant knew the insurance claims to be submitted under the scheme would be fraudulent.

Defendant argues the People were required to also prove he had a motive for soliciting Dr. Iqbal to file fraudulent claims, and the People failed to meet that burden.[7]

---

[7] In the context of his argument for reversing his solicitation conviction, defendant contends the People did not prove a charge of receiving a "kickback" in violation of Business and Professions Code section 650, for which, he claims, the jury was instructed with CALCRIM No. 3221. As the People point out in their brief, defendant is mistaken. Defendant was *not* charged with receiving an illegal kickback in violation of section 650 of the Business and Professions Code—Dr. Iqbal was. An expert for the People acknowledged that statute only applies to licensed medical professionals like Dr. Iqbal (see Bus. & Prof. Code, § 650, subd. (a)), but testified defendant received "kickbacks" in the more colloquial sense of receiving a cut from the illegal fees received by Dr. Iqbal for filing fraudulent claims.

The trial court instructed the jury with CALCRIM No. 3221 in relation to the aggravated white collar crime sentencing allegation under Penal Code section 186.11, and on appeal defendant does not challenge the jury's true finding on that allegation. And, although the jury was also instructed on the definition of a "kickback" in violation of Business and Professions Code section 650, it related to the People's theory that defendant conspired with Dr. Iqbal with the intent that *Dr. Iqbal* receive illegal kickbacks prohibited under that statute.

14

Not so. "'Motive is the *emotional* urge that induces a particular act.'" (*People v. Pettigrew* (2021) 62 Cal.App.5th 477, 495.) "[W]ith few exceptions, motive itself is not an element of a criminal offense." (*People v. Smith* (2005) 37 Cal.4th 733, 740.)

The jury instruction for solicitation to commit insurance fraud that was read to the jury properly included the element that the defendant *knew* the claim was fraudulent or acted with reckless disregard of the truth of the claim, but did not include the element of a motivation—financial or otherwise—for the act. And, CALCRIM No. 370 properly instructed the jury "[t]he People are not required to prove that the defendant had a motive to commit any of the crimes charged," though motive or the absence of one were *factors* the jurors could consider when determining guilt or innocence.[8] (See *People v. Stevenson* (2018) 25 Cal.App.5th 974, 987-988.)

In sum, we conclude the record contains substantial evidence that defendant solicited Dr. Iqbal to submit insurance claims that defendant knew would be fraudulent.

D. *Conspiracy to Defraud*.

As noted, defendant asserts (rather than argues) that the record does not support his conviction on count 3 for conspiracy. Once more, we find otherwise.

"Conspiracy "'is an inchoate offense, the essence of which is an agreement to commit an unlawful act.'" [Citation.] This crime has four elements: (1) the existence of an agreement between at least two persons; (2) the specific intent to agree to commit an offense; (3) the specific intent to commit the offense that is the object of the agreement;

_____

[8] We must presume the jury understood and followed the jury instructions. (*People v. Frederickson* (2020) 8 Cal.5th 963, 1024.)

15

and (4) an overt act in furtherance of the conspiracy, which may be committed by any conspirator. (Pen. Code, § 182, subd. (a)(1); [citation].)" (*People v. Ware* (2022) 14 Cal.5th 151, 163 (*Ware*).)

"The mental state elements of conspiracy require the prosecution to demonstrate the defendant had the specific intent both to agree to the conspiracy and to commit the object offense. [Citations.] The two elements are distinct, but closely related. In some cases, it may be useful to distinguish between the two elements, especially when evidence of one is direct and the other is circumstantial. [Citations.] But in many cases, proof of the two specific intent elements will overlap. [Citation.] Together, these two specific intent elements play a critical role in a conspiracy prosecution: Proof of these elements is what separates a coconspirator from a mere bystander to the crime." (*Ware*, *supra*, 14 Cal.5th at p. 164.)

"Other than the agreement, the only act required is an overt act by *any* of the conspirators, not necessarily the defendant, and that overt act need not itself be criminal." (*People v. Smith* (2014) 60 Cal.4th 603, 616.)

"The first element, concerning the existence of an agreement, 'is the crux of criminal conspiracy.'" (*Ware*, *supra*, 14 Cal.5th at p. 163.) Defendant asserts the People introduced no evidence he "intended to agree, and specifically agreed," to submit fraudulent insurance claims for medical services performed by Dr. Iqbal. To the extent defendant contends the People were required to introduce evidence of an *express* agreement to commit insurance fraud, he is mistaken. "Conspiracy to commit a crime is

16

rarely proved as the result of testimony as to the text of a written or oral agreement." (*People v. Mares* (1975) 51 Cal.App.3d 1013, 1021.)

"""""Evidence is sufficient to prove a conspiracy to commit a crime "if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime."""" [Citation.] "Evidence of an agreement does not require proof that the parties met and expressly agreed; a criminal conspiracy can be shown through circumstantial evidence. . . ."" [Citation.] """"The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy.""""" (*People v. Lamb* (2024) 16 Cal.5th 400, 442.)

The record contains substantial evidence that defendant conspired to file fraudulent insurance claims. The evidence shows defendant approached Dr. Iqbal and presented him with a plan to enroll Dr. Iqbal's patients in group insurance plans, under the guise of naming them employees of Free Choice and two sham companies, to pay for services not covered by their current insurance policies. The additional coverage under the new policies would allow Dr. Iqbal to perform more expensive services for his patients that were not covered by their current policies, most of which were through government assistance plans such as Medi-Cal and Medicaid.

Defendant and his coconspirator LaPorte formed sham limited liability companies—Drexel Group and Kingmakers—then deceived Dr. Iqbal's patients into signing documents that purported to make them employees of those companies.

Defendant collected the patients' information and enrolled them in the group health insurance policies, falsely stating the patients were full time employees and eligible for insurance, when neither of them ever performed work for which they were compensated. The conspirators also used payroll services ADP or Oasis to issue fake paychecks to the patients, but LaPorte, who was given power of attorney by the patients (unknowingly), endorsed and deposited the sham paychecks into Free Choice's and Drexel's bank accounts.

Dr. Iqbal signed an agreement with Free Choice stating that, for any patients he convinced to switch from their current medical insurance to insurance policies obtained by Free Choice, Dr. Iqbal would pay to Free Choice 30 to 35 percent of the fees he collected from those insurance companies. Dr. Iqbal paid defendant, through Free Choice or Drexel Group, several checks that represented the agreed upon percentage defendant was to receive from the insurance billings per the agreement. Defendant referred to this fee sharing as commission.

Based on the evidence, a reasonable jury could conclude beyond a reasonable doubt that defendant agreed to commit insurance fraud and was guilty of conspiracy.

E. *Money Laundering.*

Next, defendant claims, without supporting argument, that his convictions for money laundering on counts 9 through 17 are not supported by substantial evidence. He contends the People introduced no evidence he had the intent to commit insurance fraud and, therefore, that he knew the kickbacks from Dr. Iqbal to Free Choice that were

18

deposited into Drexel Group's bank account were the proceeds of illegal activity. We conclude the record contains substantial evidence that defendant was guilty of money laundering.

California's money laundering statute criminalizes "use [of] a financial institution in the State of California to promote criminal activity or to transact proceeds derived from a crime." (*People v. Mays* (2007) 148 Cal.App.4th 13, 22, superseded by statute on another ground as stated in *People v. Bolding* (2019) 34 Cal.App.5th 1037, 1042-1046.) "Any person who conducts or attempts to conduct a transaction or more than one transaction within a seven-day period involving a monetary instrument or instruments of a total value exceeding five thousand dollars ($5,000) . . . through one or more financial institutions (1) with the specific intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any criminal activity, or (2) knowing that the monetary instrument represents the proceeds of, or is derived directly or indirectly from the proceeds of, criminal activity, is guilty of the crime of money laundering." (§ 186.10, subd. (a).) "A transaction includes a deposit into or withdrawal from a financial institution." (*Mays*, at p. 22, citing § 186.9, subd. (c); see § 186.9, subd. (b) [defining "'[f]inancial institution'" to include banks].)

As already explained, *ante*, the record contains substantial circumstantial evidence of defendant's specific intent to aid and abet Dr. Iqbal in committing insurance fraud and of his knowledge that the claims to be submitted to insurance carriers by Dr. Iqbal would be fraudulent. An investigator testified that exhibits 105 through 114 were 10 checks

drawn by Dr. Iqbal from his account with Wells Fargo and deposited into a Chase account held by Drexel Group and Free Choice. The amounts of the checks ranged from $30,000 to $76,467 and totaled just over $442,000. The investigator testified those checks "essentially were the 30 percent kickback that, per contract, Dr. Iqbal had agreed to pay to Free Choice" and defendant. With no objection from defendant, exhibits 105 through 114 were admitted into evidence.

In sum, the record contains substantial evidence that for counts 9 through 17, defendant conducted at least one financial transaction of over $5,000 with the intent to carry on and facilitate insurance fraud and/or with the knowledge that the checks from Dr. Iqbal represented the proceeds of insurance fraud.

F. *Character Evidence.*

Last, defendant contends (again, without any supporting argument) that evidence he introduced at trial of his own good character for honesty and integrity was enough to raise a reasonable doubt as to his guilt. Upon request, a defendant is entitled to an instruction informing the jury that opinion or reputation evidence of one of the defendant's good character traits offered to prove the defendant acted in conformity with that trait should be weighed as any other fact established, and that such evidence may be sufficient to create a reasonable doubt as to his guilt. (*People v. Bell* (1875) 49 Cal. 485, 490; Evid. Code, § 1102, subd. (a).)

The trial court properly instructed defendant's jury with CALCRIM No. 350 that it had to decide the meaning and importance of good character evidence. Defendant's mere

20

assertion that evidence of his good character did, in fact, raise a reasonable doubt asks this court to reweigh the evidence and second guess the jury's implied credibility determinations, something we simply cannot do.  (*People v. Houston* (2012) 54 Cal.4th 1186, 1215 ["'We do not reweigh evidence or reevaluate a witness's credibility.'"].)

## III.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


McKINSTER
Acting P. J.


We concur:


MILLER
J.


MENETREZ
J.